JOHNSON AND CASSIDY, PETITIONERS, *v.* STATE OF NEW JERSEY.

[Cite as Johnson and Cassidy v. State of New Jersey, 8 Ohio Misc. 324.]

(No. 762—Decided June 20, 1966.)

United States Supreme Court.

*Mr. Stanford Shmukler* and *Mr. M. Gene Haeberle,* for petitioners.

*Mr. Norman Heine,* for respondent.

*Mr. Duane R. Nedrud,* for National District Attorneys Association, *amicus curiae,* by special leave of Court. (Also in Nos. 759, 760 and 584.)

Mr. Chief Justice WARREN delivered the opinion of the Court.

In this case we are called upon to determine whether *Escobedo* v. *State of Illinois,* 378 U. S. 478, 32 O. O. 2d 31, 84 S. Ct. 1758, 12 L. Ed. 2d 977 (1964), and *Miranda* v. *State of Arizona,* 384 U. S. 436, 36 O. O. 2d 237, 86 S. Ct. 1602, 16 L. Ed 2d 694, should be applied retroactively. We hold that *Escobedo* affects only those cases in which the trial began after June 22, 1964, the date of that decision. We hold further that *Miranda* applies only to cases in which the trial began after the date of our decision one week ago. The convictions assailed here were obtained at trials completed long before *Escobedo* and *Miranda* were rendered, and the rulings in those cases are therefore inapplicable to the present proceeding. Petitioners have also asked us to overturn their convictions on a number of other grounds, but we find these contentions to be without merit, and consequently we affirm the decision below.

Petitioner Cassidy was taken into custody in Camden, New Jersey, at 4 a. m. on January 29, 1958, for felony murder. The police took him to detective headquarters and interrogated him in a systematic fashion for several hours. At 9 a. m. he was brought before the chief detective, two other police officers, and a court stenographer. The chief detective introduced the persons present, informed Cassidy of the possible charges against him, gave him the warning set forth in the margin,[1] concluded that he understood the warning, and obtained his consent to be

---

[1] "I am going to ask you some questions as to what you know about the hold-up, but before I ask you these questions it is my duty to warn you that everything you tell me must be of your own free will, must be the truth, without any promises or threats having been made to you, and knowing anything you tell me can be used against you, or any other person, at some future time."

questioned. Cassidy was then interrogated until 10:25 a. m. and made a partial confession to felony murder. The stenographer recorded this interrogation and read it back to Cassidy for his acknowledgment. Police officers then took him to another part of the building and apparently questioned him further. At 12:15 p. m. he was brought back to the chief detective's office for another half-hour of recorded interrogation. Under circumstances similar to those already described, Cassidy amended his confession to add vital incriminating details. For the next 11 hours he was held in a detention room and may have been subjected to further questioning. At 11:40 p. m. the police returned him to the chief detective's office for a final brief round of recorded interrogation. Taken together, Cassidy's three formal statements added up to a complete confession of felony murder, and they were later introduced against him at his trial for that crime.

While the present collateral proceeding was pending following our decision in *Escobedo,* Cassidy filed affidavits in the New Jersey Supreme Court which detailed for the first time certain supposed circumstances of his confession. In his own affidavit, he claimed that on at least five separate occasions during his interrogation, he asked for permission to consult a lawyer or to contact relatives. The police allegedly either ignored these requests or told him that he could not communicate with others until his statement was completed. Cassidy also produced affidavits from his mother, his uncle, and his aunt, claiming that during this period they called the detective headquarters at least three times and once appeared there in person, seeking information about Cassidy and an opportunity to speak with him. Their efforts allegedly were thwarted by police. These belated claims were left uncontroverted by the State and were accepted as true by the court below for purposes of the *Escobedo* issue.

The police took petitioner Johnson into custody in Newark, New Jersey, at 5 p. m. on January 29, 1958, for the same crime as Cassidy. He was taken to detective headquarters and was booked. Later in the evening the police brought him before a magistrate for a brief preliminary hearing. The record is unclear as to what transpired there. Both before and after the ap-

pearance in court, he was questioned in a routine manner. At 2 a.m. the police drove Johnson by auto to Camden, the scene of the homicide, 80 miles from Newark. During the auto ride he was again interrogated about the crime. Upon arrival in Camden at about 4:30 a. m., the police took him directly to detective headquarters and brought him before the chief detective, three other police officers, and a court stenographer. As in Cassidy's case, Johnson was introduced to the persons present, informed of the possible charges against him, and given the same warning already set forth. He stated that he understood the warning and was willing to be questioned under these conditions. The police then interrogated him until 6:20 a. m., a period of about one and one-half hours. During the course of the questioning, he made a full confession to the crime of felony murder. This interrogation was recorded by the stenographer and read back to Johnson for his acknowledgment.

Like Cassidy, Johnson filed affidavits in the New Jersey Supreme Court in this collateral proceeding following our decision in *Escobedo,* detailing for the first time certain supposed circumstances of his confession. In his own affidavit, he claimed that at four separate points during the period described above, he asked for permission to consult a lawyer or to contact relatives so that they could obtain a lawyer for him. As in Cassidy's case, the police allegedly either ignored these requests or told him that he could not communicate with others until he had given a statement. Johnson also produced affidavits from his mother and his girl friend, claiming that on three occasions after the homicide and prior to the confession, they called detective headquarters or went there in person, seeking information about Johnson and an opportunity to speak with him. Their efforts allegedly were rebuffed by the police. These belated claims, like Cassidy's, were left uncontroverted by the State and were accepted as true by the court below for resolution of the *Escobedo* issue.

The confessions of Johnson and Cassidy were offered in evidence by the State at their joint trial for felony murder. The judge held a hearing out of the presence of the jury on the voluntariness of the confessions. Petitioners made no effort to rebut the testimony adduced by the State relating to this issue,

The judge found the confessions voluntary and admitted them into evidence. Petitioners then expressly relinquished their right under state law to have the issue of voluntariness, and the accompanying evidence, submitted to the jury for redeterination.[2] They did not introduce any testimony to dispute the correctness of their confessions.

In summation at the close of trial, defense counsel explicitly asserted that the confessions were truthful and pleaded for leniency on this ground. Cassidy's lawyer stated to the jury:

"Whatever is in this statement made by Stanley Cassidy is true. I know it is true. * * * [M]y reason for knowing that it is true is because of the meetings and consultations I have had with Stanley. We have been over this many, many times.

"I know it is true because I know Chief Dube, and Chief Dube is a fine interrogator. If you do not answer truthfully, believe me, he will question you until he does get the truth, and Chief Dube got the truth." Likewise Johnson's lawyer told the jury:

"The statement of Johnson was truthful and honest, because when that was finished, that was the end of it.

"* * *

"There were no threats. There was no attempt to evade. There was no trickery. Anything that Chief Dube asked him he answered honestly and truthfully." The jury found Johnson and Cassidy guilty of murder in the first degree without recommendation of mercy, and they were sentenced to death.[3]

The convictions of Johnson and Cassidy became final six years ago, when the New Jersey Supreme Court affirmed them

---

[2] The procedure prescribed by state law was outlined in the opinion below as follows:

"Under the New Jersey procedure for the admission in evidence of a confession, the trial judge must first determine whether the confession was voluntary. If he finds the confession to be voluntary, and hence admissible, he instructs the jury to also consider the voluntariness of the confession and to disregard it unless the state proves it was voluntarily given." 43 N. J. 572, 586, n. 9, 206 A. 2d 737, 744-745, n. 9.

[3] A third defendant, Wayne Godfrey, was also found guilty and sentenced to death. His conviction was subsequently overturned by a federal court in post-conviction proceedings. Upon retrial for felony murder, he pleaded *non vult* and was sentenced to life imprisonment.

upon direct appeal[4] and the time expired for petitioners to seek certiorari from the decision. There followed a battery of collateral attacks in state and federal courts based on new factual allegations, in which petitioners repeatedly and unsuccessfully assailed the voluntariness of their confessions.[5] This appeal arises out of still another application for post-conviction relief, accompanied by a fresh set of factual allegations, in which petitioners have argued in part that their confessions were inadmissible under the principles of *Escobedo*. The court below rejected the claim, holding that *Escobedo* did not affect convictions which had become final prior to the date of that decision,[6] and it is this holding which we are principally called upon to review. In view of the standards announced one week ago concerning the warnings which must be given prior to in-custody interrogation, this case also obliges us to determine whether *Miranda* should be accorded retroative application.

In the past year we have twice dealt with the problem of retroactivity in connection with other constitutional rules of criminal procedure. *Linkletter* v. *Walker* (1965), 381 U. S. 618, 33 O. O. 2d 118, 85 S. Ct. 1731, 14 L. Ed. 2d 601; *Tehan* v. *United States, ex rel. Shott* (1966), 382 U. S. 406, 35 O. O. 2d 391, 86 S. Ct. 459, 15 L. Ed. 2d 453. These cases establish the principle that in criminal litigation concerning constitutional claims, ''the Court may in the interest of justice make the rule prospective * * * where the exigencies of the situation require such an application.'' 381 U. S., at 628, 33 O. O. 2d at 123, 85 S. Ct., at 1737; 382 U. S., at 410, 86 S. Ct., at 461. These cases also delineate criteria by which such an issue may be resolved. We must look to the purpose of our new standards governing police interrogation, the reliance which may have been placed upon prior decisions on the subject, and the effect on the administration of

---

[4]*State* v. *Johnson* (1960), 31 N. J. 489, 158 A. 2d 11.

[5]*State* v. *Johnson* (1960), 63 N. J. Super. 16, 163 A. 2d 593, affirmed, 34 N. J. 212, 168 A. 2d 1, cert. denied, 368 U. S. 933, 82 S. Ct. 370, 7 L. Ed. 2d 195 (1961); *United States, ex rel. Johnson*, v. *Yeager* (1964), 327 F. 2d 311 (C. A. 3d Cir.), cert. denied, 377 U. S. 984, 84 S. Ct. 1890, 12 L. Ed. 2d 751. See also *State* v. *Johnson* (1962), 71 N. J. Super. 506, 177 A 2d 312, affirmed, 37 N. J. 19, 179 A. 2d 1, cert. denied. 370 U. S. 928, 82 S Ct. 1572, 8 L. Ed. 2d 508.

[6]43 N. J. 572, 206 A. 2d 737.

justice of a retroactive application of *Escobedo* and *Miranda.* See 381 U. S., at 636, 85 S. Ct., at 1741; 382 U. S. at 413, 86 S. Ct., at 464.

In *Linkletter* we declined to apply retroactively the rule laid down in *Mapp* v. *Ohio* (1961), 367 U. S. 643, 16 O. O. 2d 384, 81 S. Ct. 1684, 6 L. Ed. 2d 1081, by which evidence obtained through an unreasonable search and seizure was excluded from state criminal proceedings. In so holding, we relied in part on the fact that the rule affected evidence "the reliability and relevancy of which is not questioned." 381 U. S., at 639, 85 S. Ct., at 1743. Likewise in *Tehan* we declined to give retroactive effect to *Griffin* v. *State of California* (1965), 380 U. S. 609, 32 O. O. 2d 437, 85 S. Ct. 1229, 14 L. Ed. 2d 106, which forbade prosecutors and judges to comment adversely on the failure of a defendant to testify in a state criminal trial. In reaching this result, we noted that the basic purpose of the rule was to discourage courts from penalizing use of the privilege against self-incrimination. 382 U. S., at 414, 86 S. Ct., at 464.

As *Linkletter* and *Tehan* acknowledged, however, we have given retroative effect to other constitutional rules of criminal procedure laid down in recent years, where different guarantees were involved. For example, in *Gideon* v. *Wainwright* (1963), 372 U. S. 335, 23 O. O. 2d 258, 83 S. Ct. 792, 9 L. Ed. 2d 799, which concerned the right of an indigent to the advice of counsel at trial, we reviewed a denial of habeas corpus. Similarly, *Jackson* v. *Denno* (1964), 378 U. S. 368, 28 O. O. 2d 177, 84 S. Ct. 1774, 12 L. Ed. 2d 908, which involved the right of an accused to effective exclusion of an involuntary confession from trial, was itself a collateral attack. In each instance we concluded that retroactive application was justified because the rule affected "the very integrity of the fact-finding process" and averted "the clear danger of convicting the innocent." *Linkletter* v. *Walker,* 381 U. S., at 639, 33 O. O. 2d, at 128, 85 S. Ct., at 1743; *Tehan* v. *United States ex rel. Shott,* 382 U. S., at 416, 35 O. O. 2d at 391, 86 S. Ct., at 465.

We here stress that the choice between retroactivity and nonretroactivity in no way turns on the value of the constitutional guarantee involved. The right to be represented by counsel at trial applied retroactively in *Gideon* v. *Wainright, supra,*

has been described by Justice Schaefer of the Illinois Supreme Court as "by far the most pervasive * * * of all of the rights that an accused person has."[7] Yet Justice Brandeis even more boldly characterized the immunity from unjustifiable intrusions upon privacy, which was denied retroactive enforcement in *Linkletter* as "the most comprehensive of rights and the right most valued by civilized men."[8] To reiterate what was said in *Linkletter*, we do not disparage a constitutional guarantee in any manner by declining to apply it retroactively. See 381 U. S., at 629, 85 S. Ct., at 1737.

We also stress that the retroactivity or nonretroactivity of a rule is not automatically determined by the provision of the Constitution on which the dictate is based. Each constitutional rule of criminal procedure has its own distinct functions, its own background of precedent, and its own impact on the administration of justice, and the way in which these factors combine must inevitably vary with the dictate involved. Accordingly as *Linkletter* and *Tehan* suggest, we must determine retroactivity "in each case" by looking to the peculiar traits of the specific "rule in question." 381 U. S., at 629, 85 S. Ct., at 1737; 382 U. S., at 410, 86 S. Ct., at 461.

Finally, we emphasize that the question whether a constitutional rule of criminal procedure does or does not enhance the reliability of the fact-finding process at trial is necessarily a matter of degree. We gave retroactive effect to *Jackson* v. *Denno, supra,* because confessions are likely to be highly persuasive with a jury, and if coerced they may well be untrustworthy by their very nature.[9] On the other hand, we denied retroactive application to *Griffin* v. *State of California, supra,* despite the fact that comment on the failure to testify may sometimes mislead the jury concerning the reasons why the defendant has refused to take the witness stand. We are thus concerned with a question of probabilities and must take account

[7]Federalism and State Criminal Procedure, 70 Harv. L. Rev. 1, 8 (1956).

[8]*Olmstead* v. *United States* (1928), 277 U. S. 438, 478, 48 S. Ct. 564, 572, 72 L. Ed. 944 (dissenting opinion).

[9]Coerced confessions are, of course, inadmissible regardless of their alleged truth or falsity. See *Rogers* v. *Richmond* (1961), 365 U. S. 534, 81 S. Ct. 735, 5 L. Ed. 2d 760.

among other factors, of the extent to which othed safeguards are available to protect the integrity of the truth-determining process at trial.

Having in mind the course of the prior cases, we turn now to the problem presented here: whether *Escobedo* and *Miranda* should be applied retroactively.[10] Our opinion in *Miranda* makes it clear that the prime purpose of these rulings is to guarantee full effectuation of the privilege against self-incrimination, the mainstay of our adversary system of criminal justice. See 384 U. S., p.——, 36 O. O. 2d, p. 237, 86 S. Ct., p. 1619-1624. They are designed in part to assure that the person who responds to interrogation while in custody does so with intelligent understanding of his right to remain silent and of the consequences which may flow from relinquishing it. In this respect the rulings secure scrupulous observance of the traditional principle, often quoted but rarely heeded to the full degree, that "[t]he law will not suffer a prisoner to be made the deluded instrument of his own conviction."[11] Thus while *Escobedo* and *Miranda* guard against the possibility of unreliable statements in every instance of in-custody interrogation, they encompass situations in which the danger is not necessarily as great as when the accused is subjected to overt and obvious coercion.

At the same time, our case law on coerced confessions is available for persons whose trials have already been completed, providing of course that the procedural prerequisites for direct or collateral attack are met. See *Fay* v. *Noia* (1963), 372 U. S.

---

[10] It appears that every state supreme court and federal court of appeals which has discussed the question has declined to apply the tenets of *Escobedo* retroactively. For example, see *In re Lopez* (1965), 62 Cal. 2d 368, 42 Cal. Rptr. 188, 398 P. 2d 380; *Ruark* v. *People* (1965), Colo. 405 P. 2d 751; *Commonwealth* v. *Negri* (1965), 419 Pa. 117, 213 A. 2d 670; *United States, ex rel. Walden* v. *Pate* (C. A. 7th Cir. 1965), 350 F. 2d 240. The commentators, however, are divided on this issue. Compare Mishkin, Forward: The High Court, The Great Writ, and the Due Process of Time and Law, 79 Harv. L. Rev. 56 (1965), which opposes retroactive application, with Comment, *Linkletter, Shott,* and the Retroactivity Problem in *Escobedo* (1966), 64 Mich. L. Rev. 832.

[11] 2 Hawkins, Pleas of the Crown, 595 (8th ed. 1924).

391, 24 O. O. 2d 12, 83 S. Ct. 822, 9 L. Ed. 2d 837. Prisoners may invoke a substantive test of voluntariness which, because of the persistence of abusive practices, has become increasingly meticulous through the years. See *Reck* v. *Pate* (1961), 367 U. S. 433, 81 S. Ct. 1541, 6 L. Ed. 2d 948. That test now takes specific account of the failure to advise the accused of his privilege against self-incrimination or to allow him access to outside assistance. See *Haynes* v. *State of Washington* (1963), 373 U. S. 503; 83 S. Ct. 1336, 10 L. Ed 2d 513; *Spano* v. *People of State of New York* (1959), 360 U. S. 315, 79 S. Ct. 1202, 3 L. Ed 2d 1265. Prisoners are also entitled to present evidence anew on this aspect of the voluntariness of their confessions if a full and fair hearing has not already been afforded them. See *Townsend* v. *Sain* (1963), 372 U. S. 293, 83 S. Ct. 745, 9 L. Ed. 2d 770. Thus while *Escobedo* and *Miranda* provide important new safeguards against the use of unreliable statements at trial, the nonretroactivity of these decisions will not preclude persons whose trials have already been completed from invoking the same safeguards as part of an involuntariness claim.

Nor would retroactive application have the justifiable effect of curing errors committed in disregard of constitutional rulings already clearly foreshadowed. We have pointed out above that past decisions treated the failure to warn accused persons of their rights, or the failure to grant them access to outside assistance, as factors tending to prove the involuntariness of the resulting confessions. See *Haynes* v. *State of Washington, supra; Spano* v. *People of State of New York, supra.* Prior to *Escobedo* and *Miranda*, however, we had expressly declined to condemn an entire process of in-custody interrogation solely because of such conduct by the police. See *Crooker* v. *State of California* (1958), 357 U. S. 433, 78 S. Ct. 1287, 2 L. Ed. 2d 1448; *Cicenia* v. *La Gay* (1958), 357 U. S. 504, 78 S. Ct. 1297, 2 L. Ed. 2d 1523. Law enforcement agencies fairly relied on these prior cases, now no longer binding, in obtaining incriminating statements during the intervening years preceding *Escobedo* and *Miranda.* This is in favorable comparison to the situation before *Mapp* v. *Ohio* (1961), 367 U. S. 643, 16 O. O. 2d 384, 81 S. Ct. 1684, where the states at least knew that they were con-

stitutionally forbidden from engaging in unreasonable searches and seizures under *Wolf* v. *People of State of Colorado* (1949), 338 U. S. 25, 69 S. Ct. 1359, 93 L. Ed. 1782.

At the same time, retroactive application of *Escobedo* and *Miranda* would seriously disrupt the administration of our criminal laws. It would require the retrial or release of numerous prisoners found guilty by trustworthy evidence in conformity with previously announced constitutional standards. Prior to *Escobedo* and *Miranda*, few states were under any enforced compulsion on account of local law to grant requests for the assistance of counsel or to advise accused persons of their privilege against self-incrimination. Compare *Crooker* v. *State of California* 357 U. S., at 448, n. 4, 78 S. Ct., at 1296 (dissenting opinion). By comparison, *Mapp* v. *Ohio, supra*, was already the law in a majority of the states at the time it was rendered, and only six states were immediately affected by *Griffin* v. *State of California* (1965), 380 U. S. 609, 32 O. O. 2d 437, 85 S. Ct. 1229. See *Tehan* v. *United States, ex rel. Shott,* 382 U. S. at 418, 35 O. O. 2d 396, 86 S. Ct., at 466.

In the light of these various considerations, we conclude that *Escobedo* and *Miranda*, like *Mapp* v. *Ohio, supra*, and *Griffin* v. *State of California, supra*, should not be applied retroactively. The question remains whether *Escobedo* and *Miranda* shall affect cases still on direct appeal when they were decided or whether their application shall commence with trials begun after the decisions were announced. Our holdings in *Linkletter* and *Tehan* were necessarily limited to convictions which had become final by the time *Mapp* and *Griffin* were rendered. Decisions prior to *Linkletter* and *Tehan* had already established without discussion that *Mapp* and *Griffin* applied to cases still on direct appeal at the time they were announced. See 381 U. S., at 622 and n. 4, 85 S. Ct., at 1237; 382 U. S., at 409, n. 3, 86 S. Ct., at 461. On the other hand, apart from the application of the holdings in *Escobedo* and *Miranda* to the parties before the court in those cases, the possibility of applying the decision, only prospectively is yet an open issue.

All of the reasons set forth above for making *Escobedo* and *Miranda* non-retroactive suggest that these decisions should apply only to trials begun after the decisions were announced.

Future defendants will benefit fully from our new standards governing in-custody interrogation, while past defendants may still avail themselves of the voluntariness test. Law enforcement officers and trial courts will have fair notice that statements taken in violation of these standards may not be used against an accused. Prospective application only to trials begun after the standards were announced is particularly appropriate here. Authorities attempting to protect the privilege have not been apprised heretofore of the specific safeguards which are now obligatory. Consequently they have adopted devices which, although below the constitutional minimum, were not intentional evasions of the requirements of the privilege. In these circumstances, to upset all of the convictions still pending on direct appeal which were obtained in trials preceding *Escobedo* and *Miranda* would impose an unjustifiable burden on the administration of justice.

At the same time, we do not find any persuasive reason to extend *Escobedo* and *Miranda* to cases tried before those decisions were announced, even though the cases may still be on direct appeal. Our introductory discussion in *Linkletter*, and the cases cited therein, have made it clear that there are no jurisprudential or constitutional obstacles to the rule we are adopting here. See 381 U. S., at 622-629, 85 S. Ct., at 1733-1737. In appropriate prior cases we have already applied new judicial standards in a wholly prospective manner. See *England* v. *Louisiana State Board of Medical Examiners* (1964), 375 U. S. 411, 84 S. Ct. 461, 11 L. Ed. 2d 440; *James* v. *United States* (1961), 366 U. S. 213, 81 S. Ct. 1052, 6 L. Ed. 2d 246. Nor have we been shown any reason why our rule is not a sound accommodation of the principles of *Escobedo* and *Miranda*.

In the light of these additional considerations, we conclude that *Escobedo* and *Miranda* should apply only to cases commenced after those decisions were announced. We recognize that certain state courts have perceived the implications of *Escobedo* and have therefore anticipated our holding in *Miranda*. Of course, states are still entirely free to effectuate under their own law stricter standards than those we have laid down and to apply those standards in a broader range of cases than is required by this decision.

Apart from its broad implications, the precise holding of *Escobedo* was that statements elicited by the police during an interrogation may not be used against the accused at a criminal trial,

"[where] the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent * * *." 378 U. S., at 490-491, 84 S. Ct., at 1765.

Because *Escobedo* is to be applied prospectively, this holding is available only to persons whose trials began after June 22, 1964, the date on which *Escobedo* was decided.

As for the standards laid down one week ago in *Miranda*, if we were persuaded that they had been fully anticipated by the holding in *Escobedo*, we would measure their prospectivity from the same date. Defendants still to be tried at that time would be entitled to strict observance of constitutional doctrines already clearly foreshadowed. The disagreements among other courts concerning the implications of *Escobedo*,[12] however, have impelled us to lay down additional guidelines for situations not presented by that case. This we have done in *Miranda*, and these guidelines are therefore available only to persons whose trials had not begun as of June 13, 1966. See *Tehan* v. *United States, ex rel. Shott*, 382 U. S., at 409, 35 O. O. 2d at 391, 86 S. Ct., at 461, n. 3, with reference to *Malloy* v. *Hogan* (1964), 378 U. S. 1, 84 S. Ct. 1489, 12 L. Ed. 2d 653, and *Griffin* v. *State of California, supra.* Petitioners challenge the validity of their convictions on several other grounds, all of which we have examined with great care, including the claim that their confessions were coerced. We conclude without unnecessary discus-

---

[12]For example, compare *People* v. *Dorado* (1965), 62 Cal. 2d 338, 42 Cal. Rptr. 169, 398 P. 2d 361, and *People* v. *Dufour* (1965), R. I., 206 A. 2d 82, which construe *Escobedo* broadly, with *People* v. *Hartgraves* (1964), 31 Ill. 2d 375, 202 N. E. 2d 33, and *Browne* v. *State* (1964), 24 Wis. 2d 491, 129 N. W. 2d 175, 131 N. W. 2d 169.

sion that those grounds which may be tested on this direct review of the judgment of the New Jersey Supreme Court are without merit.  We further find that petitioners' contentions relating to the voluntariness of their confessions are beyond the scope of our direct review in this proceeding.

Petitioners' coerced confession claim was fully litigated and rejected both at trial and in prior post-conviction hearings in the state courts.  On neither occasion, however, did petitioners attempt to substantiate certain allegations made for the first time in the present proceeding.  As stated above, petitioners now assert that they were prevented from obtaining outside assistance while they were being interrogated.  The police allegedly refused them access to their families or a lawyer and also thwarted the efforts of their relatives and friends to contact them.  We have already pointed out that allegations of this kind are directly relevant to a coerced confession claim and that such a claim presents no problem of retroactivity.  See also *Davis* v. *North Carolina*, 384 U. S. ——, 86 S. Ct. 1761, 16 L. Ed. 2d ——.

The New Jersey Supreme Court invoked a state procedural rule, previously applied in another confession case, as a bar to reconsideration of petitioners' coerced confession claim, even in the light of their new allegations regarding the denial of outside assistance.  See N. J. R. R. 3:10 A. 5 (1965 Supp.); *State* v. *Smith* (1964), 43 N. J. 67, 202 A. 2d 669.  This is an adequate state ground which precludes us from testing the coerced confession claim on the present review, whatever may be the significance of the state court's reliance on its procedural rule in federal habeas corpus proceedings.  See *Fay* v. *Noia* (1963), 372 U. S. 391, 24 O. O. 2d 12, 83 S. Ct. 822.

The judgment of the Supreme Court of New Jersey is affirmed.

*Judgment affirmed.*

Mr. Justice CLARK concurs in the opinion and judgment of the court.  He adheres, however, to the views stated in his separate opinion in *Miranda* v. *Arizona*, 384 U. S. ——, 36 O. O. 2d 237, 86 S. Ct. 1602.

Mr. Justice HARLAN, Mr. Justice STEWART, and Mr. Justice WHITE concur in the opinion and judgment of the court. They continue to believe, however, for the reasons stated in the dissenting opinions of Mr. Justice Harlan and Mr. Justice White in *Miranda* v. *Arizona* and its companion cases, 384 U. S. 436, 36 O. O. 2d 237, 86 S. Ct. 1602, that the new constitutional rules promulgated in those cases are both unjustified and unwise.

Mr. Justice BLACK, with whom Mr. Justice DOUGLAS joins, dissents from the court's holding that the petitioners here are not entitled to the full protections of the Fifth and Sixth Amendments as this court has construed them in *Escobedo* v. *State of Illinois*, 378 U. S. 478, 32 O. O. 2d 31, 84 S. Ct. 1758, and *Miranda* v. *Arizona*, 384 U. S. 436, 36 O. O. 2d 237, 86 S. Ct., p. 1602, for substantially the same reasons stated in their dissenting opinion in *Linkletter* v. *Walker*, 381 U. S. 618, at 640, 33 O. O. 2d 118, 85 S. Ct. 1731, at 1743.