THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.*
HONORIO ADORNO LORENZANA, Defendant and Appellant.

Nos. CR-65-150    Decided December 15, 1966.
CR-65-151.

*Honorio Adorno Lorenzana, pro se. José Rafael Gelpí* and
*Stanley L. Feldstein* for appellant. *J. B. Fernández Badillo,
Solicitor General,* and *Nilita Vientós Gastón, Assistant So-
licitor General,* for The People.

PER CURIAM: Honorio Adorno Lorenzana, appellant herein,
was convicted by a jury of the offense of murder in the
second degree and a violation of the Weapons Law. The facts
may be summarized as follows.

Rafael Pérez Balzac, the victim, was assistant to the
Dean of Administration of the University of Puerto Rico.
In the performance of his duties Pérez Balzac was appel-
lant's superior. Appellant had been a University guard and
at the time of the occurrence he was special investigator
for the University. Pérez Balzac, as Adorno's immediate
supervisor, had had to call the latter's attention on several
occasions because of faults he had committed in the discharge
of his duties: he had availed himself of a copy of a master
key without authorization to do so; had taken courses at
the University during working hours without permission
from his supervisors, and other violations.

Pérez Balzac had summoned appellant to his office the morning of June 21, 1962. That morning Adorno appeared at Pérez Balzac's office; Balzac asked him to sit down to which Adorno refused, saying to his superior: "Tell me what you have to say that I'll listen standing up." Pérez Balzac told Adorno that at a certain future date he would cease as special investigator but that he could submit an application for guard at the University.

Adorno left Pérez Balzac's office, took a car and went to Urbanización Victoria, to his compadre Juan Matos Ortiz' home and once there commissioned the latter to do some things for him in case he, Adorno, "did not return within the next two or three days." From there Adorno went to Country Club Development where he lived. There, at his home, he took a revolver, loaded it, put some extra bullets in his pocket, took the car again and went back to the University. He parked the car in front of the University Tower and, armed with the revolver, went to Rafael Pérez Balzac's office. Adorno entered the office and firing five shots killed him. He fired seven times, for which he had to reload the revolver after firing the first six bullets. (He used a 38 Colt Cobra, which is a short-barrel six-shooter revolver, caliber 38.) Two of the shots hit Pérez Balzac when he was already on the floor.

On appeal he assigns the following errors:

1. "Admissions of appellant obtained in violation of his constitutional rights were admitted in evidence."

2. "Appellant was not advised of his constitutional right to legal counsel during the investigatory stage."

3. "Appellant was not advised of his constitutional right to remain silent and not incriminate himself."

4. "Appellant was submitted to a psychiatric examination in violation of his constitutional rights."

5. "The trial court made prejudicial comments in the presence of the jury which deprived appellant of his right to an impartial trial."

6. "The instructions given to the jury were erroneous and confusing."

7. "The additional instructions requested by appellant were erroneously denied and evidence in support thereof erroneously excluded."

### I.

Let us examine assignments one, two and three. These errors are based on the admission in evidence of the testimony of policeman Ángel Feliciano. Feliciano talked to appellant at the Río Piedras police station on the morning of the occurrence. The policeman's testimony challenged by appellant is as follows:

First, in the absence of the jury:

"Q. Could you tell the court under which circumstances you had occasion to talk to him?

"A. I asked Honorio Lorenzana if he had fired the six bullets and he, who was very nervous, answered yes but. . . .

.    .    .    .    .    .    .    .

"A. I asked him about the reasons for the investigation of the case and Lorenzana told me that he had been laid off."

Then, in the presence of the jury:

"A. Well, for the investigation I was conducting I asked Honorio Adorno Lorenzana whether he had fired the six shots and Adorno. . . .

.    .    .    .    .    .    .    .

"A. Whether he had fired the six bullets and Adorno Lorenzana answered yes but that he did not remember how many bullets there had been.

.    .    .    .    .    .    .    .

"A. I asked him what reasons he had and he told me that he had been laid off by Balzac and that he had gone to Balzac's office to ask for an explanation for the motives, and Balzac did not tell him.

.    .    .    .    .    .    .    .

"To ask for the reasons Balzac had for his lay off, and Balzac

did not tell him which gave rise to a discussion between them, Honorio Adorno left and came back later when he fired the shots."

■ This testimony is challenged because it contains admissions of appellant made during the investigatory stage of the proceeding. The fact that those admissions were free and spontaneous, without the least trace of deceit or physical or psychological coercion is not questioned. The commission of the offense was not denied either. When policeman Feliciano testified his testimony was not challenged in any way or evidence contrary to it introduced.

Since appellant, in arguing these three first errors, bases himself principally on *Escobedo* v. *Illinois*, 378 U.S. 478 (1964) and on *Rivera Escuté* v. *Delgado, Warden*, 92 P.R.R. 746 (1965), it is necessary to point out the following. When the trial in this case was held (last days of July and first days of August 1963) the cases of *Escobedo*, *Rivera Escuté*, and *Miranda* v. *Arizona*, 384 U.S. 436 (1966) had not yet been decided. Appellant's trial was held in accordance with the law then in force. As we have pointed out, it was a year after said trial had been held that the Supreme Court of the United States passed on the *Escobedo* case and it was in October 1965 that we decided the *Rivera Escuté* case where we adhered to the constitutional criteria of *Escobedo*. Nevertheless, in *Rivera Escuté* we did not issue the habeas corpus requested therein.

After the radical rules of *Escobedo* and *Miranda* had been established by the Supreme Court of the United States, it is in *Johnson* v. *New Jersey*, 384 U.S. 719 (1966) where said Court, speaking through its Chief Justice Warren, explains the *ratio decidendi* in those opinions. The Court has been especially concerned, as shown by its most recent decisions and as it clearly appears from its opinion in *Johnson* v. *New Jersey*, with the very integrity of the fact-finding process and avoiding the clear danger of convicting the innocent.

384 U.S. 728. From a study of that recent case law it can be noticed that that concern for the integrity of the fact-finding process was spurred by the excesses committed by the police of some states.

As the concurring opinion in the *Rivera Escuté* case points out, fortunately we do not have in Puerto Rico a notorious record of those proscribed practices. *Escobedo* and *Miranda* are heroic case law rulings to end with confessions obtained by coercion in the United States. In the instant case, it must be remembered, there is not the slightest trace of such coercion.

After the Court explains in *Johnson* v. *New Jersey*, its militant attitude against the illegal practices in the investigation and against coerced confessions, the Court states:

"We also stress that the retroactivity or nonretroactivity of a rule is not automatically determined by the provision of the Constitution on which the dictate is based. Each constitutional rule of criminal procedure has its own distinct functions, its own background of precedent, and its own impact on the administration of justice, and the way in which these factors combine must inevitably vary with the dictate involved."

In the case at bar we know that the integrity of the fact-finding process was not marred by coercion and it is neither doubted nor denied that appellant committed the murder. He himself does not deny it. Furthermore, the second element for concern by the Court in *Johnson* v. *New Jersey* does not come into play either—the conviction of an innocent person—because the danger of convicting an innocent is not present in the case at bar. As we stated in *Rivera Escuté:*

"A new constitutional interpretation should be retroactively applied only in those situations in which the new rule protects the innocent accused against the possibility of being convicted for a crime which he did not commit."

In *Rivera Escuté* we expressly rejected the myth that all constitutional interpretations are eternal verities that stretch

backwards and forwards to infinity. There we said that the justification of the requirement of the right to counsel at the accusatory stage lies in the prospective purpose of improving the administration of justice by drying up the sources of coercion and that no purpose would be served by applying *Escobedo* retroactively.

We agree with the Supreme Court of the United States when it declares ". . . we do not find any persuasive reason to extend *Escobedo* and *Miranda* to cases tried before those decisions were announced, even though the cases may still be on direct appeal," 384 U.S. 733, and when it adds that ". . . retroactive application of *Escobedo* and *Miranda* would seriously disrupt the administration of our criminal laws. It would require the retrial or release of numerous prisoners found guilty by trustworthy evidence in conformity with previously announced constitutional standards." *Ibid.*, 731.

In *Johnson* v. *New Jersey* the Court states that the examination it has made of these questions in said case leads it to conclude that the decisions in *Escobedo* and *Miranda* should apply only to trials begun after those decisions were announced. Future trials shall be guided by those decisions and that in the cases already adjudged the defendants may still avail themselves of the non voluntariness of the confessions if such be the case.[1]

■ Pursuant to the foregoing this Court declares that the decision in *Escobedo* is available only to persons whose trials began after June 22, 1964 (date of that decision) and that the rulings established in *Miranda,* which we had previously established in *Rivera Escuté* v. *Delgado, Warden,* 92 P.R.R. 746 (1965) are available only to persons whose trials had not

---

[1] "All of the reasons set forth above for making *Escobedo* and *Miranda* nonretroactive suggest that these decisions should apply only to trials begun after the decisions were announced. Future defendants will benefit fully from our new standards governing in-custody interrogation, while past defendants may still avail themselves of the voluntariness test." 384 U.S. 732.

begun on October 26, 1965, date on which we decided the case of Rivera.

We are of the opinion that the reasonings of the Supreme Court of the United States stated in *Johnson* v. *New Jersey* lead to a sound administration of justice, safeguarding the conflicting interests of the defendants and society and that is why we adopt them now.

## II.

■ There is another aspect of the question by virtue of which we also believe that the three errors under discussion are not reversible. It is that, during the trial, defendant's defense consisted in alleging mental illness. Expert testimony was introduced and the jury weighed it and returned its verdict. It was the jury's duty to pass on that evidence. *People* v. *Sánchez*, 79 P.R.R. 110 (1956). If appellant admitted having committed the act for which he was arraigned, how could he have been prejudiced by the testimony of policeman Feliciano regarding his admissions? Besides, the evidence of the commission of the offense on the part of appellant, independently of his admissions and independently of policeman Feliciano's testimony, is so abundant and clear—there are even eyewitnesses—that there is not the slightest doubt in this Court, just as there was none in the jury, that appellant committed the crime. There is no need then for reversal to vindicate the integrity of the fact-finding process or to prevent the conviction of an innocent person.

## III.

■ The fourth error assigned consists in maintaining that the constitutional rights of appellant were violated because he was submitted to a psychiatric examination. We are convinced that the error lacks merit. The examination, made during the fact-finding process, had the dual purpose of

protecting the defendant, because he should not have been prosecuted if he was mentally irresponsible, and of protecting society because it would also have been futile to continue with the action. Appellant submitted to the examination voluntarily. 164 A.L.R. 967; 25 A.L.R.2d 1407; 8 Wigmore, On Evidence 399, § 2265(10) (1961 ed.); *Early* v. *People*, 352 P.2d 112 (1960); *State* v. *Myers*, 67 S.E.2d 506 (1957); *Clements* v. *State*, 210 S.W.2d 912 (1948).

We have examined also the last three assignments. There is no merit in them and they in no way justify a reversal. We do not find any merit either in the errors assigned by appellant in the memorandum he submitted in his own right.

The judgments appealed from will be affirmed.

Although Mr. Justice Blanco Lugo did not intervene in the decision of this case, he is in agreement with the rule announced in the opinion, adding that he would extend the pronouncement in *Escobedo* to suits filed after the decision in *Rivera Escuté*, all in accordance with the concurring opinion delivered by him in the latter case.