## DORIS HELENE HOTT v. STATE OF MARYLAND

[No. 220, September Term, 1967.]

■■■■■■

*Decided February 29, 1968.*

■■■■■■

The cause was argued before MURPHY, C. J., and ANDER-SON, MORTON, ORTH, and THOMPSON, JJ.

*William L. Wilson,* with whom was *Edward J. Ryan* on the brief, for appellant.

*Donald Needle, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Donald W. Mason, State's Attorney for Allegany County,* and *J. Frederick Sharer, Deputy State's Attorney for Allegany County,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

Doris Helene Wilson married Howard Vernon Hott on August 22, 1952 when she was 19 years of age. Four children were born of the marriage, the oldest, as of May 1966, being 12 years of age and the youngest 5 years of age. For the first four years of the marriage all went well, but the marriage relationship from that time on was marked by frequent beatings by the husband of his wife. Although the husband drank excessively, the beatings appeared to be the result of his violent temper rather than alcohol. He beat her up and blackened her eyes "many a times," gave her a "bloody nose, bloody mouth," broke her teeth, making it necessary for her to get a dental plate, hit her in the ear causing a hearing defect, broke her eyeglasses

about five or six times—"that is what he would hit for first because I can't see without my glasses"—kicked her in the stomach, pulled her hair, knocked her down, beat her with his fist and whipped her with a belt. He would beat her up because "that is just the way he was. He just had a bad temper and would beat me up just for little things I did around the house or for mistakes I made." He destroyed the household effects while in his angry moods and in 1965 she bought five sets of new dishes because he broke "all the others that I had." He called her a whore and cursed her in the presence of the children and taunted her as being only half a woman after she had a hysterectomy. He beat the children on occasions and compelled them to watch while he beat her. She called the police on only one occasion in January 1966, because he told her that if she ever reported the beatings he would kill her and the children. She also did not want him arrested because she thought "it might make him lose his job at the mill or something like that." He was a good provider, giving her all but about $15 of his weekly check of between $50 and $100.

About October 1965 Howard Hott became ill "in the form mostly of gastrointestinal complaints, nausea, vomiting and stomach ache pain that cleared up." In December of that same year he had "some swelling of his face and redness of his eyes and * * * some more abdominal pain." He began to have burning and tingling sensations in his fingers and toes. On February 1, 1966 he was admitted to Potomac Valley Hospital complaining of recurrent vomiting, discomfort in the upper abdomen, a skin rash on the hands and feet and a tingling sensation of the hands and feet. Routine laboratory and X-ray studies indicated he had "an ulcer in the first part of the small intestine just below the stomach. It was initially felt that this ulcer could have caused his vomiting and discomfort in the upper abdomen and he was started on routine ulcer management." He was in the hospital until February 10th and his condition seemed to improve. When he was discharged "he had persistent numbness and tingling in the hands and feet, but otherwise he was essentially asymptomatic." The day following his discharge from the hospital he again began to have recurrent vomiting and discomfort in the upper abdomen. He was

readmitted to the hospital on February 13, 1966 and "his condition had deteriorated considerably. At that time he complained of rather severe headache, recurring vomiting, discomfort in the upper abdomen, weakness of the upper extremities, and of the lower extremities, making it somewhat difficult for him to walk and the parasthesia or numbness of his hands and feet had increased." The exact cause for this set of symptoms was not apparent to his physician and on February 17th he was transferred to West Virginia University Medical Center. At that time "he was seriously ill * * * and his condition was deteriorating relatively rapidly." His pulse was fast, his heart rate was fast, his skin was dry and his mouth, throat and the lining inside his eyes were dry and inflamed. He had a scaling red rash on his body and decreased breath sounds in the base of both lungs. There was no evidence of heart failure except the fast heart rate and a chest X-ray confirmed this. He could not move his arms and legs and his reflexes were diseased. Based on symptoms, findings and laboratory data the conclusion clinically was that he was suffering from arsenic intoxication. He died March 2, 1966. The final clinical diagnosis was death due to arsenic intoxication. The conclusion on the findings of the autopsy was that the cause of death was "cardiac failure secondary to myocarditis, which was produced by arsenic." An analysis was made of specimens of the deceased's liver, bones, hair and fingernails. Arsenic was present in each.

On March 30, 1966 the wife of the deceased gave a statement to the police which was reduced to writing, subscribed and sworn to by her. She described the marital relationship substantially as heretofore summarized. She said that in September 1965 her husband "brought home a bottle of poison and poured it along the cellar walls" because there were termites in the cellar. He used it all and brought home a second bottle which he placed on a window-shelf in the basement "right beside the door that goes outside." On Monday or Tuesday before Halloween, either October 25th or 26th 1965 she "started to put it in Howard's coffee * * * I put it in his coffee for supper that night." She put about a half an inch of the poison in his cup of coffee. He drank it. He had slapped her and called her a whore two days before and "it took me that long to get enough

nerve to do it." She put about the same amount of poison in his coffee at supper three or four days before Thanksgiving, about November 22, 1965 and again the day after Christmas, 1965. Either Friday or Saturday, January 14th or 15th, 1966 she and her husband had been out and when they arrived home he shoved her for no reason at all. Her brother was present and her husband hit her "three or four times" and pulled her hair. Her brother made him stop. Her husband asked for another cup of coffee. "When he said that, I thought that would be a good time to give him another shot." She brought the poison bottle up from the cellar, poured the same amount as before in a cup, filled the cup with coffee and gave it to her husband. "He drank the cups of coffee each of the four times I put the poison in them." After that she did not give him "any additional poison * * * he got sick on Sunday, January 30, 1966, and that's the reason I didn't have to give him any more." She agreed to give the bottle and its remaining contents to the police and accompanied them to her home. She gave them a pint bottle of "Elkays Insect Killer." It had been locked in a cabinet in the basement.

On April 4, 1966 the grand jury presented that Doris Helene Hott did "murder Howard Vernon Hott by administering a certain poison." An indictment was returned against her and she was tried in the Circuit Court of Allegany County before a jury. On May 17, 1966 she was found guilty of poisoning and defiling and corrupting and contaminating certain drink or food of Howard Vernon Hott, which was the offense charged in the second count of the four count indictment, the other counts charging the offenses of murder by poison, attempt to commit the offense of which she was convicted and attempt to poison. On June 22, 1966 she was sentenced to imprisonment for a term not to exceed 8 years.

On appeal from the judgment it is contended that the evidence was not sufficient to sustain the conviction and that the written statement given by her to the police was improperly admitted in evidence.

The offense of which the appellant was convicted is proscribed by Art. 27, § 451, Md. Code (1967 Repl. Vol.). The section consists of only one sentence but contains two parts. The

first part concerns the corruption or contamination of sources of domestic water supply "by means of disease germs or bacteria or the insertion of any other poison or poisonous matter therein." The second part provides:

> "* * * and every person, his aiders and abettors, who, by like means, knowingly and wilfully poisons, defiles or in any way corrupts or contaminates any drink, food or food products or supply, or attempts so to do, or conspires or connives thereat; shall be guilty of a felony * * *."

It is clear, therefore, that the poisoning, defiling, corruption or contamination of drink or food must be by means of disease germs, bacteria, poison or poisonous matter.

There was in evidence two definitions of poison. A resident physician in internal medicine at the West Virginia University Medical Center defined it, according to Dorland's Medical Dictionary, as "any substance when injected into, digested, absorbed, applied or made within the body itself or inhaled, can cause damage to structure or disturbance of functioning." An "assistant toxicologist to the Chief Medical Examiner's Office in Baltimore" stated:

> "A poison, in very broad terms, is any substance absorbed by any roots to any significant amount which proves detrimental to the health or causes death."

A chemist for the West Virginia State Police made an analysis of Elkays Insect Killer and found no arsenic in it. He stated that the compounds contained in the solution "could be harmful, but it takes a fairly large quantity of it to be harmful." He was unable to give an opinion as to how great a quantity would prove harmful to a human being but he did not believe that the amount of liquid shown to have been taken out of the bottle of the insect killer given to the police by the appellant over a period of four months would have any deleterious effect mixed with coffee. Nor could the toxicologist give a definite answer as to what quantity would have to be taken in order for it to be toxic or harmful:

"It's not easy to answer this question. Lots of things have to be considered. What amount might be fatal or what amount might cause an ill effect. Considering that a man who is healthy was impaired already, for example, by abuse of alcohol, it might be quite different and be much less amount of the substance to be injurious to health. We do know definitely from the literature, for example, that quite a margin exists in taking such substances from small amounts up to one liter. Even so, the question cannot be easily answered by saying well, one gram or ten milliliters is poisonous or toxic or harmful."

His analysis showed that the principal ingredient, 99.5 per cent, of Elkays was a solvent, a hydrocarbon, which he referred to in plain terms as kerosene. There was a "very, very small concentration of the three chemicals which are considered as insect killers * * *. If you take now a cupful of this substance, even a coffee cup full of this substance, there might only be a few drops or a few crystals of this insect killer in it (the rest being the solvent, kerosene) * * * so the harmful effect of the solvent has to be considered primarily, I think."

It has been consistently held that in order to overturn a judgment entered on the verdict of a jury for insufficiency of the evidence, it is necessary that there be no legally sufficient evidence or rational inferences drawable therefrom on which the jury could find a defendant guilty beyond a reasonable doubt. *Agresti v. State,* 2 Md. App. 278, 284.

We agree with the appellant that the evidence adduced was not sufficient to show that the coffee, by the introduction in it of Elkays, was poisoned, defiled or in any way corrupted or contaminated by the means required by the statute. Elkays was not shown to be a poison within the definitions. One expert did not believe that the amount of the substance alleged to have been placed in the coffee over a period of four months would have any deleterious effect. It appeared from the testimony of the other expert that the three chemicals considered as insect killers in the substance were not in sufficient quantity in the coffee to be harmful and that if the Elkays was harmful to

the deceased it would have to be from the solvent, kerosene. But there is no evidence that his illness was caused by the kerosene. On the contrary, his illness and death were from arsenic poisoning, and no arsenic was found in Elkays. However, this finding is not dispositive of the case. The proof of the charge under which the appellant was convicted was not limited to Elkays Insect Killer as the means of poisoning the food, and the question is whether there was sufficient evidence or rational inferences drawable therefrom on which the jury could find the appellant guilty beyond a reasonable doubt of contaminating the food or drink of her husband by means of arsenic.

We think it clear from the evidence that arsenic is a poison —it was the cause of the death of Howard Vernon Hott. The internist produced by the State stated that the most common form of arsenic, arsenic trioxide, is "a white powder, practically tasteless and odorless." In her statement the appellant said the label of the bottle containing the substance which she put in her husband's coffee contained the word "Poison." She said, I read the label and it said, 'Do Not Take Internally' and 'Poison.' " Asked how the word "Poison" was written out, she replied, "I don't remember but it said "Poison." On the stand she admitted saying that. The bottle of Elkays given by her to the police did not contain the word "Poison" anywhere on the labels. Although the label on the back of the bottle cautions: "Harmful if swallowed," the labels do not say "Do Not Take Internally." Further in her statement upon being asked when she noticed the words on the label of the bottle of poison, "Do Not Take Internally" and "Poison" she replied, "When Howard was pouring it out one time, I don't remember when it was." The word "poison" in describing what she gave her husband is used some forty-five times in the statement, once in her own handwriting when she interlined, "He drank the cups of coffee each of the four times I put the poison in them," but the substance is never referred to as Elkays and when asked if she knew what kind of poison she was administering to her husband she said "no," explaining in her testimony that she so answered "because it wasn't any poison * * * I knew it wouldn't hurt him because I stuck my finger down in the bottle and tasted it myself." Yet she also said that she decided to poison

her husband because of the beatings, "I was going to hurt him like he hurt me." She also said in her statement that the bottle was full when she started to give it to her husband and that after putting it in his coffee four times it was "a little over half full." The bottle given to the police was marked by them to show the height of the contents. The mark indicated that it was over three-quarters full. Elkays, on its labels, represents that it "controls flies, mosquitoes, ants, several types of roaches, water bugs, centipedes, silverfish, gnats, bed bugs and clothes moths." Termites are not mentioned, but her husband bought something to kill what he thought were termites. There was testimony that forms of arsenic, calcium arsenate and lead arsenate, are in other insecticides. The toxicologist testified that he poured some of the Elkays Insect Killer into a cup of coffee because "* * * when I was confronted first with the problem I got this bottle, which has a certain odor and which I immediately saw is an immersible solvent with water. I wondered how that could be, how can it be mixed because it won't mix. If you pour that into any liquid solution like coffee or water or what have you you certainly will have a separation of the two layers. It's like oil pouring on water. It doesn't mix with it. It stays as a clear layer on top of it. It has a peculiar faint odor and I wondered, without knowing anything about the case, how anybody could drink such a thing, if he is not, if you permit me to say, drunk. He would immediately recognize there is something which doesn't belong in it. So, without knowing anything about the case, I just wondered, * * *, how anybody could drink such a thing." We think, therefore, that there was sufficient evidence for the jury to find that it was not the Elkays Insect Killer that the appellant put in her husband's coffee and that the bottle she gave to the police did not contain the substance she put in his coffee. Whether she gave that bottle to the police by mistake or on purpose is immaterial. But it does not follow that there was no evidence or rational inferences therefrom sufficient for the jury to find that she put arsenic in the coffee.

During her husband's illness the attending physicians talked to her several times about poison per se and arsenic, but she made no mention to them of what she had done because she

was "afraid." Asked if she realized that if she told the doctors that she had given her husband poison "they would have a better chance of getting Howard better or saving his life," she said, "I never thought of that." There was testimony, without objection, from a sister of the deceased that the deceased said in the hospital in the presence of the appellant, that he wished his wife would get out of the room, "she has tried to poison me too many times." The appellant made no reply. Another witness, a friend of the deceased, visited the deceased at his home on February 12, 1966. This witness testified, without objection, that the deceased, "out of a clear, blue sky sat up on the bed and said, 'I believe the old woman is trying to poison me with arsenic.'" The appellant "was sitting on the other side of the bed and she looked at me and she filled up with tears and said, 'ain't that awful, the way I have been taking care of him.' And that is all that was said about that." The deceased was employed by the West Virginia Pulp and Paper Mill. A criminal investigator of the Maryland State police testified that he made an investigation at the Mill which showed that no arsenic was used there, "everything that they use is * * * Federal Drug Administration approved." The appellant was asked by the police on March 30, 1966 if her husband had any insurance on his life and she replied, "I really don't know anything about any insurance. He always took care of that." She denied that any insurance company had been in touch with her and said she had not received any insurance money. "I have a little over $300 and have been living on that." The mother-in-law, father-in-law, and two sisters-in-law of the appellant testified that on January 2, 1966 the appellant said that if anything happened to Howard "I will be a rich widow." There was evidence that the appellant was the beneficiary of an "immediate relief fund" from the employer of her husband in the amount of $1102.50 and under a group insurance policy in the amount of $6000. There was testimony from an insurance agent that the appellant was the beneficiary under two insurance contracts totalling $15,460 and that he had discussed them with the deceased and appellant in March of 1963. He had called on the appellant about March 8, 1966, received the policies from her and completed the claim forms. At the time of the trial

only $500 had been paid to the appellant and this from the amount due under the immediate relief fund.

It is not disputed that the appellant put something in her husband's coffee on four separate occasions, the latter part of each of October, November and December 1965 and the middle of January 1966. Her husband first became ill in October 1965. In December 1965 he had "swelling of his face and redness of his eyes * * * some more abdominal pains" and burning and tingling sensations in his fingers and toes. He became much worse on January 30, 1966 and was admitted to the hospital on February 1st. He improved enough to be discharged but the day after he returned home he began to have recurrent vomiting and discomfort in the upper abdomen. After three days at home his condition had deteriorated considerably and he was readmitted to the hospital. He died on March 2nd and it was determined that his illness and death were due to arsenic poisoning. From the evidence, the appellant had a primary motive and obvious opportunity to administer poison to her husband. We do not inquire into and measure the weight of the evidence to ascertain whether the State has proved its case beyond a reasonable doubt, as that is the prerogative of the trier of facts. But we think it clear that the evidence and proper inferences therefrom were sufficient to show that the appellant had contaminated the coffee of her husband by means of arsenic and that the jury, on such evidence and inferences could find the appellant guilty as charged beyond a reasonable doubt.

The contention that the written statement given by the appellant to the police was improperly admitted in evidence is predicated upon the allegation that the guidelines enunciated in *Miranda v. Arizona*, 384 U. S. 436, were not followed by the police in obtaining the statement. She does not contend that it was otherwise involuntary. *Miranda* is only applicable to those cases, the trial of which began after June 13, 1966. *Johnson v. New Jersey*, 384 U. S. 719; *Boone v. State*, 2 Md. App. 80. The appellant's trial began May 16, 1966 and *Miranda* is not available to her.

*Judgment affirmed; appellant to pay costs.*