**UNITED STATES of America ex rel. Chico MOYA, Petitioner,**

v.

**John L. ZELKER, Superintendent of Green Haven Correctional Facility, Stormville, New York, Respondent.**

**No. 71 Civ. 1430.**

United States District Court, S. D. New York.

July 16, 1971.

---

Chico Moya, pro se.

Louis J. Lefkowitz, Atty. Gen. of State of New York, for respondent, Arlene R. Silverman, Asst. Atty. Gen., of counsel.

## OPINION

FRANKEL, District Judge.

Petitioner is serving a term of ten to twelve years imposed in January of 1963 for the crime of armed robbery in the first degree. His conviction was unanimously affirmed by the Appellate Division, 23 A.D.2d 720, 257 N.Y.S.2d 907 (1965), and Judge Fuld denied leave to appeal to the State Court of Appeals. His main basis for claiming a right to release on federal habeas is the contention that a woman's stocking, knotted and evidently having served as a mask, was taken from his pocket and used as evidence against him in violation of his rights under the Fourth and Fourteenth Amendments. The facts material for our purposes are as follows:

Three men, one brandishing a gun, entered and robbed a New York City delicatessen on 9th Avenue, between 17th and 18th Streets, at around 9:00 p.m. on December 19, 1961. Those present in the store and put in fear by the robbers were the store owner, his wife, and two customers, one male and one female. The robbers wore masks fashioned from women's stockings. After taking the available money, they shut the victims into a walk-in refrigerator and left. The victims were released by customers a couple of minutes later.

At about 9:25 p.m. two officers riding in a patrol car received a report of the robbery over their radio. They sped to the scene, conversed with people there, and proceeded to the corner of 8th Avenue and 18th Street, where they spoke to another police officer, and where, it also appears, a bystander yelled something out to them. (These things, regrettably, were adduced before the jury, so that the content of the conversations, presumably usable by the prosecution on the question of suppression, was not received.) Immediately after this, the officers went south on Eighth Avenue (a one-way street northbound), and turned east on 16th Street. While words said to them are not in the record, it seems evident that something other than blind chance accounted for the unusual route they followed. In the middle of the 16th Street block between 8th and 7th Avenues, the officer came abreast of petitioner, who was walking hurriedly eastward, keeping his face turned toward the buildings. He was breathing heavily and sweating. The officers stopped their car and approached petitioner with drawn guns. They ordered him to put his hands up against the wall. Holding him in that posture, one of the officers ran his hands in a frisk along the outer side of petitioner's clothing. With the frisk in progress, they asked him what he was doing. He said he was visiting friends—on 49th Street. Asked where he now thought himself to be, he said 47th Street. One of the officers asked him what he'd done with the gun. He said: "I didn't have a gun, I had my hand in my pocket." Asked where "the other fellow was," he said, according to one officer, "there was nobody with me, I did it myself;" according to the other, he said "I was not with anybody, I was by myself."

The trial court found—and the record sustains the finding—that these questions and damaging answers occurred while the officer was feeling petitioner's outer garments (as the officer said) "for anything bulky which might be a gun or a knife." After those exchanges the officer reached into petitioner's coat pocket, pulled out the stocking mask later used at the trial and complained of here, returned the stocking to the pocket, and handcuffed the petitioner. They returned to the store and

thence to police headquarters, during which journey there were identifications of petitioner and extensive admissions by him—all of which added to a seemingly strong case for the prosecution at trial, but need not be reviewed in detail for present purposes.[1]

According to petitioner, his arrest and the search followed the robbery by about five minutes. The chronology, in the nature of the case, is nowhere given in split seconds. Petitioner's estimate seems consistent, however, with the totality of the evidence bearing on the subject.

Petitioner moved before trial to suppress the stocking mask. The question was postponed for decision by the trial judge. Petitioner was first brought to trial on October 22, 1962. In the course of that trial, he renewed his contention that the stocking had been taken in an unlawful search and should therefore be excluded. The trial judge overruled the objection. On October 26 a mistrial was declared when the jury found itself unable to reach a verdict.

In the retrial, begun on November 13, 1962, defense counsel again sought unsuccessfully to exclude the stocking mask. While the trial court wrote no opinion on the subject, the judge did, as has been mentioned, record the important finding that petitioner's incriminating admissions had accompanied the frisk and preceded the search of his pocket in which the stocking was first taken.

■ Petitioner renews, as his main point here, the argument that the stocking was unlawfully seized and therefore inadmissible. Respondent answers that the search was valid because it was incident to a lawful arrest. The court sustains this view though it may take a couple of steps to reach it.

Even on the somewhat cryptic evidence (excluding conversations) touching this subject, it is quite evident that the arresting officers were directed in swift stages from the scene of the robbery to the block on West 16th Street where they caught up with petitioner. He was walking rapidly in a direction away from the scene of the crime, holding his face toward the wall. His clothing—as the record shows, and as both the trial court and this court could not fail to consider—resembled that of one of the robbers. Perhaps, although it is unlikely, the officers did not have a description of the three men who had committed the robbery; at the very least, they must have had some directions that led them, against the flow of traffic, to precisely where petitioner was. As petitioner was approached, he was seen to be breathing hard and sweating. Given only that setting, and a freshly completed armed robbery, the officers had a right, perhaps a duty, to stop and frisk the petitioner. That much seems to follow from the principles of Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). What the officers knew and saw justified their action on grounds much "more substantial than inarticulate hunches." *Id.* at 22, 88 S.Ct. at 1880. The judgment on which they acted appears to have been far less subtle and delicate than that sustained in *Terry*—which began with the feeling that the men "didn't look right" (*id.* at 5, 88 S.Ct. 1871) and culminated in the "hypothesis that these men were contemplating a daylight robbery—which, it is reasonable to assume, would be likely to involve the use of weapons" (*id.* at 28, 88 S.Ct. at 1883). Here, a robbery *had* occurred and a weapon *had* been used. Petitioner's conduct, location and demeanor buttressed an obvious "hypothesis." It does not seem permissible to

1. Stressing the evidently powerful evidence for conviction, the respondent urges that if the seizure petitioner assails was error at all, it was harmless. That would seem a cogent argument but for the fact that the stocking mask was the only exhibit for which the jury called while it deliberated.

We are always in a somewhat conjectural realm when we decide what should be deemed to have been "harmless" in a jury's reckoning. A concrete datum like the one here, together with the hanging of a prior jury, seems sufficient to defeat the State's argument.

say that the "decision * * * to seize [him] and pat his clothing for weapons was the product of a volatile or inventive imagination, or was undertaken simply as an act of harassment * * *." *Id.*

If that much is correct, the defeat of petitioner's case follows promptly. Whether or not there was probable cause for an arrest and full-scale search before the frisk, his strongly incriminating answers during the frisk [2] clearly supplied it. In this respect, the trial court's finding on chronology, which seems correct from here even if viewed as a question *de novo*, is of decisive significance.

It is appropriate, finally, to spell out this court's conclusions on a matter touched glancingly above—the absence of a pretrial hearing on the question of suppression. Petitioner says the omission of such a procedure was itself a constitutional violation sufficient to nullify his conviction. It was a device, he says, "to force [him] to testify at the actual trial, so that for all practical purposes his testimony would be worthless due to his * * * prior record." Petitioner did not in fact testify, but that is not dispositive either way on his asserted grievance. Other things seem, however, to defeat his argument.

Petitioner nowhere intimated at either of his two trials that he could have given any evidence whatever supporting the motion to suppress; nor did he indicate to the state court in his motion papers that he had any such evidence to give. It would have been a simple matter to excuse the jury at trial and hear petitioner on the question of suppression if that had been requested. Having sought no such thing when it might have been meaningful, over eight years ago, petitioner makes an insufficient point of procedure when he seeks to have his conviction erased because there was no pretrial hearing.

In sum, then, the record is sufficient as it stands to defeat petitioner's claims. His petition must be, and it is, denied.

So ordered.

---

**2.** Apart from the absence of any objection to the introduction of the statements at trial, Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), came three years later and has no application here. Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966).