THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
THOMAS McKINLAY, DEFENDANT-APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued May 22, 1967—Decided July 24, 1967.

Carton, J. A. D., dissented.

Before Judges SULLIVAN, KOLOVSKY and CARTON.

*Mr. Sidney B. Kaufman* for defendant-appellant (*Messrs. Sheldon & Kaufman,* attorneys).

*Mr. David J. Hughes,* Assistant County Prosecutor, for plaintiff-respondent (*Mr. Leo Kaplowitz,* Union County Prosecutor, attorney).

PER CURIAM. Defendant appeals from his conviction on the first count of a three count indictment charging him with misconduct in office. He was found not guilty on the second count and the third count was dismissed at the end of the State's case.

Defendant was an inspector in the Division of Motor Vehicles assigned to administer examinations to applicants for a New Jersey driver's license. He was stationed at the Rahway Driver Qualification Center.

The first count of the indictment charged defendant with a violation of *N. J. S. A.* 39:3–10 in that he unlawfully, willfully, knowingly and corruptly approved the qualifications of one Ismael Arocho as an applicant for a New Jersey driver's license knowing full well that the said applicant did not possess such qualifications and, in reliance thereon, the Division of Motor Vehicles issued a New Jersey driver's license to the said applicant.

The State's evidence showed that defendant had signed the driver's permit of Arocho indicating that he corrected Arocho's written examination paper, administered a vision test and a driving test to Arocho, and had passed him on all three tests as qualified. On the basis of defendant's signa-

tures on the permit, an approved application card was issued to Arocho on which he obtained a driver's license.

Arocho testified through an interpreter that he went to the Rahway testing center in the company of one Pepe Suarez. There they met Raoul Martinez who took Arocho to the building in the testing center and made a sign in the direction of defendant. Arocho went in the building, obtained an examination paper which contained questions on both sides written in English. He wrote his name and address on the paper and made some scribble marks on the front side of the paper. He testified that he could neither read nor write English. He turned his examination paper in to defendant who then administered a vision test. Arocho testified that he looked at the chart and "Well I read A, B, C, nothing more." (There was evidence that the letters on the chart were not in alphabetical order.) Arocho's permit shows that defendant signed as to both tests on the same date.

At a later date Arocho, in the company of Martinez, returned for his driving test. Again Martinez motioned to Arocho "that that was the fellow who was going to give me the driver's test" but Arocho became afraid and did not take the test. Martinez then took Arocho's permit and went inside the building. When Martinez returned he gave Arocho an approved application card which Arocho signed, mailed with the necessary fee and received back his driver's license.

The State's evidence showed that an approved application card would not issue unless an inspector had signed the applicant's permit showing he had taken and passed all three tests. Arocho's original permit, on file in the Division of Motor Vehicles, showed that defendant signed for all three tests.

Defendant argues that the conviction cannot stand because the State failed to prove that the alleged wrongful acts were committed in bad faith. It is further argued that there was no proof of corrupt behavior as alleged in the indictment.

We find no merit in these contentions. Our review of the record satisfies us that the State produced substantial

credible evidence from which the jury could have found defendant guilty of the charge contained in Count 1 beyond a reasonable doubt. The evidence was more than adequate to support a finding of the requisite criminal intent. *State v. Begyn*, 34 *N. J.* 35 (1961); *State v. Jefferson*, 88 *N. J. L.* 447 (*Sup. Ct.* 1916), *affirmed* 90 *N. J. L.* 507 (*E. & A.* 1917).

Defendant's remaining point requires some discussion. At the trial, Arocho testified that he had paid $80 to Pepe Suarez and that Suarez, in his presence, had given the money to Martinez.

Suarez testified that he brought Arocho to Rahway outside the testing center and introduced him to Martinez and gave Martinez the money which Arocho had given him.

When Arocho first testified about the payment of money, counsel for defendant objected to such testimony and moved for a mistrial since it was not shown that the money had passed to the defendant. The State conceded that it did not have any direct evidence that defendant was involved in the money transaction but argued that the factual circumstances were such that it could be inferred. The trial court held that the evidence could not be used to show that defendant received any of the money but was admissible to prove the intent of defendant through his relationship with Martinez. The jury was instructed as follows:

"All right, Ladies and Gentlemen, before continuing with the testimony, just prior to our adjournment, the State introduced certain testimony through the witness Ismael Arocho, to the effect that Mr. Arocho paid, or turned over eighty dollars to an individual identified in the courtroom as Pepe, and that Pepe, in the presence of Mr. Arocho, turned over the money to a man by the name of Martinez. There is no question at this posture of the case that Mr. McKinlay was not present at the time this occurred.

Neither the witness nor the State alleges that McKinlay had any knowledge of this monetary transaction.

I charge you in the strongest terms possible that under no circumstances, based on the facts presented, may you infer that the defendant, Mr. McKinlay, either knew of this monetary transaction or participated in any way in the transaction. You may not infer that Mr. McKinlay received any of the moneys that Mr. Arocho stated he turned over to Pepe and that Pepe turned over to Mr. Martinez.

There is no evidence in this case for you to reach such a conclusion, directly or inferentially. The evidence cannot be considered by the Jury as direct evidence of Mr. McKinlay receiving any of these moneys or circumstantial evidence of Mr. McKinlay receiving any of these moneys.

Based on the testimony so far adduced by the State, you must, as a matter of law, conclude that Mr. McKinlay did not receive any of this money. Criminal intent is an essential element of the crime charged against the defendant, Mr. McKinlay.

I will outline in detail to you the law that governs in this case, but in explaining to you the narrow purpose for which the testimony concerning the payment of the eighty dollars was allowed into evidence, it is necessary to now explain to you that phase of the law. The State must prove beyond a reasonable doubt, not only that the defendant as a public officer did not perform the duties of his office, but also that he failed to perform his duties willfully or intentionally. The proofs must support the conclusion that the acts alleged [sic] were done with evil motive or in bad faith or not honestly. The evidence of payment to Martinez is offered only to show the posture or position of Martinez in this case. Thus, if you accept the testimony that Mr. Martinez took this money with an evil motive to assist Mr. Arocho to obtain his driver's license without passing the required test, you may consider this evidence only for its probative value as it affects the intention of Mr. McKinlay, if you find a relationship between the defendant McKinlay and Mr. Martinez, bearing on the allegations set forth in the indictment.

It is for you the Jury to determine what, if any, probative value is to be given to this alleged evidence of Mr. Martinez' culpability only as it relates to the relationship between Martinez and McKinlay, in considering the essential elements of the criminal intent, which is one of the elements which the State must prove beyond a reasonable doubt in its case against the defendant. Again, I caution and I instruct that you may not consider this testimony as any evidence of receipt of the money by the defendant. Such evidence is offered solely for the narrow purpose of attempting to prove the intent of the defendant through his relationship with Martinez."

At the conclusion of the testimony by Pepe Suarez, the trial court again cautioned the jury on the narrow purpose for which the testimony as to the payment of money was being admitted.

When the State rested its case, defendant renewed his motion for a mistrial on the ground that the evidence concerning the payment of money had prejudiced defendant. This motion was denied. However, the court ruled that the State had failed to prove any connection between Martinez

and the defendant. Therefore, the court instructed the jury that it was to disregard such evidence.

At the conclusion of the case, the court in its charge to the jury emphasized that the jury was not to consider this evidence for any purpose since no relationship between Martinez and defendant had been shown.

Defendant now argues that this evidence as to the payment of money was, by its very nature, so prejudicial that it could not be cured by instructions to disregard it. Indeed, defendant argues that these several instructions merely emphasized the very matter which the jury was asked to wipe clear from its mind.

We conclude that the trial court's cautionary instructions to the jury were adequate to protect defendant from any possible prejudice. In addition to the instructions quoted above, the trial court in its charge told the jury that quite often testimony is allowed in evidence subject to a representation that it will be tied in with other evidence. The court added that the State had proved no relationship between Martinez and defendant and that the jury could infer no such relationship. "I cannot emphasize too strongly the necessity of obliterating this testimony from your minds. It is a matter of fundamental fairness. Our Jury system cannot survive without complete acceptance of this type of an instruction." In view of these strong instructions, we do not see how defendant could have been prejudiced by the testimony in question.

Defendant was not prejudiced by this testimony for another reason. In our opinion there was substantial evidence from which the jury could have reasonably found a relationship between Martinez and defendant so that the testimony in question was admissible at least for the limited purpose for which the trial court originally admitted it, Cf. State v. Goodman, 9 N. J. 569, pp. 580–581 (1952).

Martinez was the person to whom Arocho was brought and to whom the money was paid. Martinez took Arocho into the center and made a sign in the direction of defend-

ant on the day Arocho took his written examination and underwent a vision test. It was Martinez who took Arocho into the center on the date scheduled for the driving test and "motioned to me that that was the fellow who was going to give me the driver's test." When Arocho became afraid Martinez took Arocho's permit into the building and returned with an approved application for a license.

We have no direct proof of what transpired inside the building. However, the evidence did establish that an approved application would issue only if the applicant's permit showed that he had passed the written test, the vision test and the driving test. As heretofore noted, Arocho's original permit, marked in evidence, showed that defendant had signed for all three tests indicating that he had administered them to Arocho and passed him on all of them. It is reasonably inferable therefore that when Martinez went into the building he went to defendant, had him sign Arocho's permit for the driving test, and then took the completed permit and obtained an approved application for Arocho.

If Arocho's story is to be believed, defendant had to be a party to the whole sorry transaction. Otherwise defendant's conduct was incredible. He corrected Arocho's written examination paper and passed him although Arocho could not read or write English and only made a few scribbles on the front side of the paper. He administered a vision test to Arocho and passed him although Arocho said A, B, C, and nothing more. Defendant signed that he had administered a driving test to Arocho and passed him when Arocho never even took the test. This was not a case of someone substituting for Arocho. The evidence is such that if Arocho's testimony is accepted, no driving test was administered to anyone. Martinez simply went into the building and obtained defendant's signature on the permit that Arocho had taken and passed his driving test.

All of the foregoing was sufficient to establish a definite relationship between Martinez and defendant so that evi-

dence of the payment of money to Martinez was admissible, at least for the limited purpose for which the trial court originally admitted it.

The judgment is affirmed.

CARTON, J. A. D. (dissenting). The obvious inference which the jury was intended to draw from Arocho's testimony that he paid $80.00 to Pepe Suarez, who in turn passed it to Martinez, was that the money somehow reached the defendant McKinlay as the result of a corrupt bargain between McKinlay and Martinez.

The prosecutor asserted the State's purpose in offering this testimony was to establish an inference that the money came into McKinlay's hands. Yet, the trial court's initial explanation and admonition to the jury after the testimony had already been received was:

"The evidence cannot be considered by the Jury as direct evidence of Mr. McKinlay receiving any of those moneys. * * * The evidence of payment to Martinez is offered only to show the posture or position of Martinez in this case. Thus, if you accept the testimony that Mr. Martinez took this money with an evil motive to assist Mr. Arocho to obtain his driver's license without passing the required test, you may consider this evidence only for its probative value as it effects [sic] the intention of Mr. McKinlay, if you find a relationship between the defendant McKinlay and Mr. Martinez, bearing on the allegations set forth in the indictment."

The episode concerning the payment of the money from Arocho to Pepe to Martinez furnished an inherently dramatic highlight to an otherwise drab and colorless array of conflicting evidence as to whether McKinlay had deliberately, as the State claimed, passed Arocho as a qualified driver. It became a central and recurrent theme when the court first admitted Arocho's testimony; it was reiterated when Pepe Suarez testified about the transaction; it became a continuing refrain when the court instructed the jury at the end of the State's case:

"You are to disregard all evidence concerning the exchange of money from Arocho to Suarez to Martinez. You are not to consider that in your deliberations to any extent including the narrow extent that I charged you with yesterday. I will go into this in further detail in my charge to you at the end of this trial. Suffice it to say that you are to consider that testimony as if it never had been brought before you."

It was recapitulated in the final charge with a summary of the facts of the occurrence and a repetition of the court's reason for admitting the testimony as indicative of the intention of the defendant. The court then restated that the State had proved no relationship between Martinez and McKinlay and the Jury "[could] infer no such relationship," that "to draw an inference that the defendant was in any way involved with Martinez or with this payment would be (as) patently unfair * * *," and that the court could not "emphasize too strongly the necessity of obliterating this testimony from your minds. It is a matter of fundamental fairness."

The majority has expressed the opinion that "In view of these strong instructions, we do not see how defendant could have been prejudiced by the testimony in question." The assumption is that such a curative instruction had the effect of wiping the minds of all twelve members of the jury clear of all they had heard on this inflammatory issue.

Under the circumstances present here, such an assumption, in my view, is totally unfounded. It is not reasonable or realistic to believe that twelve members of any jury could have the capacity to pluck from their memories an episode so clear-cut and vivid, so deeply rooted and entwined in the evidence, and so sharply engraved in their recollection. It is unrealistic to rely upon the ritual of a curative instruction as a "sweet oblivious antidote" to cleanse the jury's mind of the potential for prejudice. (*Cf. MacBeth, Act* V, *Sc.* 3, 1.37)

The theory upon which the offensive testimony was originally admitted was that it might be competent for one purpose and not for another, and that upon appropriate instruction from the court to consider the evidence for its legally com-

petent purpose, the objecting party would be adequately protected from any specific prejudice which would otherwise require its exclusion. This device, known as the limiting instruction, as Wigmore points out, probably arose from considerations of necessity. 1 *Wigmore, Evidence, Sec.* 13, at *p.* 300 (*3d ed.* 1940). Otherwise, the only practical alternative to unlimited use or total exclusion would be to permit the admission of only the competent element of the evidence.

The limiting instruction has been characterized variously as a "naive assumption," a "judicial placebo," an "unmitigated fiction," and a "mental gymnastic" beyond anyone's power. It has been the subject of increasing critical comment by the courts and authorities and where permitted has been hedged with additional shielding safeguards. See *State v. Johnson,* 43 *N. J.* 572 (1965), aff'd. 384 *U. S.* 719, 86 *S. Ct.* 1772, 16 *L. Ed. 2d* 882 (1966); *State v. Blanchard,* 44 *N. J.* 195, 198 (1965). See also *State v. Young,* 46 *N. J.* 152, 157 (1965) which refers to many of the recent cases in which the practice has been criticized. See "The Limiting Instruction— Its Effectiveness and Effect," 51 *Minn. L. Rev.* 264 (1966).

In *State v. Young, supra,* Justice Proctor said:

"Not only is there a grave question as to the efficacy of this type of instruction in guiding the jury's deliberations, but, wherever there is a potentiality for prejudice in a criminal trial, our courts should take all reasonable measures to protect those defendants whose rights are endangered." (46 *N. J.*, at 157)

Whatever justification there may be for the use of the limiting instruction under some special circumstances as a rule of necessity, no basis appears in the record for believing that that doctrine had any application to the evidence here.

The record shows that the inherently prejudicial character of the testimony was recognized from the very first moment by the court, as well as by the parties. The court itself expressed the opinion that the testimony concerning the payment could have relevance to the issue of defendant's guilt only if a connection could be established by the State between

McKinlay and Martinez. Yet there was no representation by the State that it could prove any such connection or any dealing between the two individuals. Indeed, the prosecutor made known to the court that he could prove no more than that Martinez was employed as an agent for a driving school and by reason of frequently coming to the Qualification Center Martinez "was in the presence of the defendant McKinlay on numerous occasions." The court's remark, "as well as every other officer, I would think, in the qualification center?," cogently points up an awareness that the prosecutor was unable to represent that Martinez, as agent for a driving school, had with McKinlay more than the casual acquaintance he had with other officials with whom his employment brought him into occasional contact.

The objectionable evidence was nevertheless admitted on the fallacious assumption that if the prosecutor failed to establish a relationship which it said it could not prove except through the admission of the disputed testimony, any prejudice to the defendant could be erased by a simple instruction to the jury to disregard such evidence. It was at this point that the trial court erred as the trial judge was then aware no such relationship could be shown and the prejudice would become irrevocable once the jury heard the inadmissible evidence.

We are thus confronted not with the validity and effectiveness of an admonition ordinarily described as a limiting instruction, but the validity and effectiveness of an even less satisfactory device known in judicial parlance as a curative instruction. This type of an instruction provides an alternative to the granting of a new trial whenever inadmissible evidence is heard by the jury and is considered as adequately safeguarding the rights of an accused where it is demonstrated that the evidence contains no potential for prejudice to his rights. *Cf. State v. McLaughlin,* 93 *N. J. Super.* 435 (*App. Div.* 1967).

The trial court's first instruction, rather than eradicating the prejudicial effect of the evidence, sensitized that issue.

It suggested and emphasized that the receipt of money from Martinez might have corruptly motivated McKinlay's conduct. This suggestion arose, not by reason of anything McKinlay did, or said, or knew about, but upon the conduct of a third party admittedly unrelated to him in any way. Furthermore, the very method by which the scope of this evidence was theoretically restricted rendered defendant incapable of rebutting its damaging effect by showing that there might be other and legitimate reasons for Arocho's paying over money to Martinez.

Had the episode been confined to a mere fleeting moment, perhaps the presumption could be indulged in that the jury could obliterate the incident from its mind. But the issue was rendered more sensitive by the repetition of the testimony and the thrice repeated admonition to the jury. It is difficult to conceive of a method better designed to etch such evidence on the brain or to tease the imagination as to its significance.

I am not persuaded that a defendant's freedom should depend on the hope that the members of the jury could and would play the demanding role so thrust upon them. An assurance from this court that the jury must be presumed to have done its duty provides bleak comfort to a defendant who rightly doubts it was humanly possible for them to do so.

The majority takes a secondary position that in any event defendant could not be prejudiced by the testimony regarding the money because "there was substantial evidence from which the jury could have reasonably found a relationship between Martinez and defendant so that the testimony was admissible at least for the limited purpose for which the trial court originally admitted it." This despite the State's concession it could show no relationship upon which the admission was to be predicated, the action of the trial court in striking the testimony because of the State's failure to establish such relationship, and the court's instruction to the jury to disregard this evidence for that reason.

This approach can be justified, if at all, only on the theory that the money somehow passed or was intended to pass to McKinlay pursuant to a corrupt bargain between Martinez and McKinlay to grant Arocho a license. In effect, it is suggested that the parties, or at least Martinez and McKinlay, were parties to a corrupt agreement by which Martinez bribed McKinlay or McKinlay extorted the money, or there was a conspiracy between them to do so. Even had such a crime been specifically charged in the indictment against all of the alleged participants as defendants, such evidence could not properly be offered against McKinlay until a common purpose between the parties was shown to carry out a common design. In the case of a conspiracy, the general rule is that the existence of the conspiracy and the defendant's connection therewith must be proved *before* the acts and declaration made in defendant's absence by one charged as a co-conspirator can be shown against the defendant. *H. C. Underhill, Criminal Evidence, Sec.* 179 (5 ed. 1956). See also *Glasser v. United States,* 315 *U. S.* 60, pp. 74–75, 62 *S. Ct.* 457, 86 *L. Ed.* 680, 701 (1941):

"* * * However, such declarations are admissible over the objection of an alleged co-conspirator, who was not present when they were made, only if there is proof aliunde that he is connected with the conspiracy. (citations omitted) Otherwise hearsay would lift itself by its own boot straps to the level of competent evidence."

See *State v. Gregory,* 93 *N. J. L.* 205, 211 (*E. & A.* 1919); *State v. Yedwab,* 43 *N. J. Super.* 367, 374 (*App. Div.* 1957), certification denied 23 *N. J.* 550 (1957).

Here no such crime of bribery, extortion or conspiracy was established or sought to be established, no evidence of common design, no evidence that any of the parties had any connection with defendant. The record is bare of evidence that either Martinez or McKinlay knew each other except for casual and occasional contact resulting from the performance of their respective employments.

Nor does it follow, as the majority asserts, that if Arocho's story is to be believed defendant had to be a party to the transaction, and that "otherwise defendant's conduct was incredible." Indeed, this assumption impugns the entire thesis upon which the court submitted the case to the jury and upon which the verdict was rendered. It may be noted that the court, in response to a request from the jury for clarification of the language of the indictment, equated the word, "corruptly," with the willful doing of an act with an evil motive. See *State v. Begyn, 34 N. J.* 35, 50 (1961). This definition of the term, "corruptly," is not in the sense which it is ordinarily intended. See *State v. Sullivan,* 24 *N. J.* 18, 61 (1957), *cert.* denied 355 *U. S.* 840, 78 *S. Ct.* 52, 2 *L. Ed. 2d* 51 (1957) where Chief Justice Weintraub, dissenting, said of that term:

"In the light of our statutes it must be something more than willfulness. It does not require a dollar motivation, but it does connote an intent to obtain an advantage for some one."

The adoption by the trial court of its restricted definition of the term, "corruptly," reflects the sharp controversy that existed throughout the case as to whether a conviction could rest upon mere proof of a willful intention on the part of the defendant to violate the duties of his office and whether, by the inclusion of this term in the indictment, the State was required to carry a heavier burden of proof. In denying defendant's motion for dismissal at the end of the case, the court manifested this theory upon which the case proceeded: "[A] reasonable jury would be able to find from the proofs beyond a reasonable doubt a purposeful intention to violate the duties of his office."

To sustain the defendant's conviction on the basis of evidence stricken from the record, evidence which was not the subject of cross-examination and which the jury was directed to obliterate from its memory, presents an alternative even less attractive than one based upon the assumption the jury had and exercised the capacity of complying with the sup-

posedly curative instruction. If a defendant is to be held responsible for an interpretation of the charge which was not before the jury, simple justice would dictate that he be given the opportunity of defending on that theory of his guilt.

The majority's conclusion that defendant must have been a party to the transaction is faulty for the further reason that it proceeds on the erroneous assumption that there could be only one explanation for the conduct of the parties. The payment conceivably could have been made by Arocho to Martinez for any of a number of reasons—for instance, because of some service rendered in relation to Martinez's employment. It may be noted that the prosecutor asserted Martinez was an agent for the driving school. As for McKinlay's conduct, the verdict of guilty was consistent with the inference that the jury, in accordance with the court's instructions, found that defendant intentionally and willfully failed to perform the duties cast upon him by his office from another motivation. The damning feature of the admission of the challenged testimony was that it purported to provide a plausible motivation from a source with which he had no connection and which motivation he never had an opportunity to controvert.

In any event, if it be determined the evidence was admissible because it permitted the inference that the passing of the money was part of a corrupt bargain and motivated McKinlay's conduct, it was the function of the jury to draw such an inference and not that of an appellate court.

I would reverse and grant defendant a new trial.