**Harry F. JARMANS, Jr., Petitioner,**

v.

**UNITED STATES of America, Respondent.**

**Civ. A. No. 1363-66.**

United States District Court

District of Columbia.

Aug. 8, 1969.

Carl L. Taylor, Washington, D. C., for petitioner.

**764**

David C. Woll, Mary E. Folliard, Asst. U. S. Attys., for respondent.

## OPINION

WILLIAM B. JONES, District Judge.

On December 14, 1962, after a trial in Criminal Case No. 404–62 lasting 13 days, petitioner was found guilty by a jury of first degree premeditated murder of Olive Minard. In compliance with the statute—22–2404, D.C.Code (1967)—the Court on December 21, 1962, sentenced Jarmans to life imprisonment as the jury had recommended by unanimous vote. No appeal was taken. Petitioner now seeks to have the sentence set aside. His motion for such relief, filed, briefed and argued by his Court appointed counsel is before the Court for determination.

The motion, filed pursuant to 28 U.S. C. § 2255, asserts that confessions admitted in evidence at the 1962 trial were not voluntary but instead resulted from petitioner's intoxicated condition or from his state of mental illness or both.[1]

In order to properly understand the issue presented by petitioner's motion, a review of the evidence adduced at the criminal trial is necessary. There it was made known that in April 1959, Jarmans and Grace Victoria Gardner, "Vicky", were married. This marriage resulted in a happy relationship until 1960 when Jarmans became enamored with a girl named Nadine, a friend of his wife. He requested his wife, Vicky, to agree to a divorce and upon her refusal he discontinued living with her.

In September 1961, Jarmans stole a motor vehicle. Upon being apprehended and indicted he was committed to St. Elizabeth's Hospital for a mental examination. He was found to be without mental illness and he pleaded guilty to the charge of unauthorized use of a motor vehicle. On March 1, 1962, imposition of sentence was suspended and he was placed on probation for three years.

Shortly after being placed on probation Jarmans concluded that Vicky would not agree to a divorce and thus permit him to marry Nadine. It was then he conceived a plan to stab several unknown women in the neighborhood of his wife's home and, ultimately, to stab and kill his wife while she was walking on the street. The earlier stabbings, he hoped, would divert suspicion from him and allow him to marry Nadine and lead a normal life after his wife's death.

On April 16, 1962, Jarmans, who had returned to work at the Maryland Supermarket after being released on probation, left his place of employment shortly after 9 P.M. He carried a butcher knife with him. From 13th and Pennsylvania Avenue, Southeast, he rode with some co-workers as far as Minnesota and Pennsylvania Avenues. Walking north on Minnesota Avenue he observed Olive Minard, who was a stranger to him, alight from a bus on the corner of 31st and Minnesota Avenue. Jarmans followed her and stabbed her once in the back. As Mrs. Minard turned to face him Jarmans stabbed her in the chest several times. Then, following a circuitous and secluded route, he went home.

He arrived home between 9:30 and 9:45. He asked his mother for something to eat and was told Nadine had called and wished him to telephone her. He did so. After talking about 10 minutes with Nadine he went into the

---

1. Prior to the motion now before the Court there was a pro se motion of petitioner. As noted the Court appointed counsel to represent Jarmans and at the same time denied the pro se motion without prejudice to counsel filing a motion. Petitioner's pro se motion asserted that his retained trial counsel rendered him ineffective assistance. Court appointed counsel does not now take that position here. Counsel abandoned that contention following the first hearing on the motion he filed. (See "Petitioner's Reply Memorandum" at p. 4, n. 2.) Trial counsel, Wesley E. McDonald, is and was in 1962 an able, experienced trial lawyer who, in the best traditions of the profession, represented Jarmans in a highly skillful manner.

kitchen and ate. When he returned to the living room his mother noticed his hand had been cut and bandaged it. Jarmans told her he cut it "opening boxes in the store." In fact he apparently cut it when he stabbed Mrs. Minard and his hand slid off the handle of the knife and onto the blade. Jarmans then watched a television program and went to bed.

Two nights later, April 18, Jarmans went to visit his estranged wife at 1902 Q Street, N. W. where she lived with her parents. He told her if she didn't hurry and get a divorce he would "cut [her] liver out." The threat did not frighten her. Jarmans then told her that he had murdered Olive Minard; he told her the corner on which the murder occurred and he showed her his cut hand and the murder weapon. Except for what he said, Mrs. Jarmans observed nothing unusual about her husband's behavior.

The next day, Thursday, April 19, 1962, about 2:15 P.M. Jarmans returned to Vicky's home. Her mother and father were out of the house. Again Jarmans told her of the killing, but this time he also told her of his plan to kill several women in order to avoid suspicion when he finally killed her. Then, however, he told her his conscience was bothering him and he was going to leave town. Vicky Jarmans believed that the story of the murder was told merely to scare her. She told her husband she didn't believe him and said that if he did do it he should call the police. To that Jarmans responded:

"Do you think I am chicken? I am not chicken and I will show you and I will call the police."

Then he picked up the phone, called the police and spoke to Officer Robert Evans Smith. He told Smith that he was the one who had killed the woman on Monday night and he gave his name and address. He said he had stabbed her with a knife which he had taken from the Maryland Supermarket. He told Smith that the motive was not robbery and he gave the name of his probation officer. He would not give the address from which he was making the call. He hung up the phone and left the house.

About 3:30 A.M. the next morning, April 20, Officers Bigelow and Wheeler of the Metropolitan Police Department observed a 1949 Chevrolet traveling south on the 4500 block of Benning Road, Southeast. The officers knew the car to be stolen and when it pulled into one driveway to the shopping center parking lot on that street, the squad car pulled into the other driveway. Both cars stopped at almost the same time. As Officer Bigelow got out of the passenger side of the squad car, Harry Jarmans got out of the Chevrolet. Jarmans was carrying two butcher knives. He said that he was "Jarmans" and that the police probably wanted him. Jarmans turned the knives around and handed them to Bigelow by the handles and the officer asked if he knew anything about a murder at 31st and N Streets, Southeast. Jarmans replied,

"Yes. I killed that lady. But it wasn't at 31st and N. It was 31st and K Street, Southeast."

Jarmans said he was glad to get this "off his mind."

Jarmans was then placed in the squad car. As Bigelow walked over to close the door on the Chevrolet from which Jarmans had emerged, Jarmans said: "There is a gun under the front seat." Bigelow retrieved the gun and Jarmans was taken to the 14th Precinct.

On the way to the station house Bigelow asked Jarmans which knife was used in the killing. Jarmans replied: "The one with the blood on it is the one I used to kill the lady with." He added that he was glad it was "all over with." Jarmans also said that he had stolen the car he was driving. The three men arrived at the precinct station house about 3:40 A.M. and Jarmans was booked for unauthorized use of a motor vehicle and carrying a dangerous weapon.

At the station house, Jarmans was interviewed by Lieutenant Donohue and Detective O'Brien about 4:20 A.M. He was told he did not have to make a statement[2] but said he wanted to tell the "whole truth" about the killing. Jarmans gave a complete oral statement, finishing about 4:40 A.M.

Shortly after giving his oral statement to Donohue and O'Brien, Jarmans was taken to 31st and K Street, Southeast, where he reenacted the crime. Thereafter, at 5:35 A.M. on April 20, 1962, Jarmans signed an inculpatory statement. The reenactment of the crime and the written signed statement were excluded from evidence. Jarmans' oral statements of April 18 and 19 to his wife, his telephone statement of April 19 to Officer Smith, and his April 20 oral statement to Officers Bigelow and Wheeler and to Officers Donohue and O'Brien were received in evidence.[3] The question of the voluntariness of the admitted oral statement of Jarmans was submitted to the jury with full instructions.[4]

I

Jarmans' pro se motion to vacate the life sentence imposed contended that it was error to admit into evidence the oral statements Jarmans made to Officers Bigelow and Wheeler at the time of his arrest and to Officers Donohue and O'Brien between 4:20 and 4:40 A.M. on April 20, 1962, because, he asserted, he was in a drunken condition when those statements were made. The motion under consideration here, filed by Jarmans' counsel, incorporates that contention.

On October 13, 1967, the Court held the first hearing on the motion. Counsel for the Government called four Metropolitan Police Department Officers and examined them with respect to whether Jarmans was under the influence of alcohol between 3:30 and 4:40 A.M. on the morning of April 20, 1962. All four testified that they detected no signs of drinking. All four testified that Jarmans was alert and coherent. All four officers had had years of experience with drunks. Officer Bigelow testified he did not make a particular effort to determine whether Jarmans had been drinking because there was nothing to indicate that Jarmans' sobriety might be questionable. Detective O'Brien, however, testified that when Jarmans told him he had drunk an unspecified amount of "whiskey", O'Brien observed Jarmans specifically to determine whether he showed any effects of that drinking. Based on that observation, made about one hour after the arrest, O'Brien concluded that Jarmans was sober.

The Government also called Wesley McDonald, who was Jarmans' counsel at

---

2. As noted Jarmans' trial was held in November and December, 1962,—years before Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The form of advice by a police officer prescribed by Miranda was not required in 1962. Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966)

3. The Court, out of the presence of the jury, heard testimony concerning the above mentioned oral statements, the written signed statement and the reenactment. At the end of such hearing and still out of the presence of the jury, the Court ruled as to the admission and exclusion as noted in the text.

4. The question of voluntariness was submitted to the jury without a prior express determination by the Court. The 1962 Jarmans' trial preceded Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). However, that question must be determined by the Court in a proceeding as here under 28 U.S.C. § 2255. Jackson v. Denno at 391 ff. 84 S.Ct. 1774, Johnson v. New Jersey, 384 U.S. 719, 727–728, 86 S.Ct. 1772 (1966), Proctor v. Anderson, 124 U.S.App.D.C. 103, 361 F.2d 557 (1966). And in the District of Columbia Circuit the Court must be satisfied beyond a reasonable doubt that the confession was voluntary. Pea v. United States, 130 U.S.App.D.C. 66, 397 F.2d 627 (1968).

trial.[5] McDonald testified that he was "confident" that Jarmans had told him he was not drunk at the time of the confession. He said: "I am confident that I [asked him about his intoxication]. As to *when* I did I can't tell you, but I am confident that I asked him * * *." McDonald further stated that it was his custom and practice at that time to make inquiries as to intoxication where it might be relevant and that, having possession of Jarmans' statement to the police [6] which statement mentioned Jarmans' drinking, there was "no question" but that the matter of drunkenness was discussed. He did admit that due to the lapse of five years since the trial, he had no recollection of whether he asked Jarmans about his drinking *specifically* in connection with that paragraph of Jarmans' statement in which drinking was mentioned.

On March 8, 1968, a second hearing was held. At that time counsel for petitioner had Jarmans take the stand. Jarmans stated that he had nothing to drink prior to the time he visited his wife and phoned the police on the afternoon of April 19, 1962. After he left his wife's house about 2:30 P.M. he went to Takoma Park, Maryland, where he split a half-pint of whiskey with one Louis McMurray, finishing about 4:30 or 4:45. P.M. He then went with McMurray to Columbia Pike in Virginia where he consumed 2 or 3 beers. He left McMurray about 8:00 P.M. and went back to Maryland where he bought a fifth of whiskey about 10:00 P.M. He drank some then, and some more while driving back to the District where he arrived at Hogan's bar in Northwest Washington about 11:30 P.M. At Hogan's he drank 5 or 6 more beers between 11:30 P.M. and 2:00 A.M. when he left Hogan's he still had ⅓ of

the bottle left. He headed for Southwest Washington, drinking as he went.

Having arrived in the Southwest part of the City, Jarmans parked in a vacant lot and drank some more. He stayed about 20 minutes and finished most of the bottle. A police officer drove up and told him to move on and Jarmans did so. He then drove toward his home in Southeast Washington. He was "getting sick" and for that reason, threw out the window the bottle, which now contained about one inch of whiskey. Shortly thereafter he was arrested.

According to Jarmans' story then, after drinking a quarter of a pint of whiskey and 2 or 3 beers in the late afternoon and early evening, he drank 6–9 beers and a fifth of whiskey between 10:00 P.M. and 3:00 A.M. Yet Jarmans did not testify that he was so drunk he didn't know what he was doing at the time he confessed. On the contrary, he said he was not "especially" dizzy, and no longer felt "especially" sick. He said that he could walk and talk without difficulty, that he knew what was going on at the time and that he could still remember it six years later.

Jarmans did say that he "didn't believe" he was in control of his faculties and that he "thought" his statement at the time of his arrest was involuntary. He also admitted that the first time he thought of raising the intoxication issue with respect to his statements was long after he had been sentenced by the Court.

With that factual background the question presented is whether petitioner was so drunk that a Court could not find beyond a reasonable doubt that his statements were voluntary?

It must first be noted that Jarmans admits that he had had nothing to drink

---

5. In October 1967, it was petitioner's contention that his trial counsel was ineffective in his assistance. In such circumstances petitioner's trial counsel could properly testify in defending himself against such charges. Canon 37, American Bar Association Canons of Professional Ethics.

6. The statement referred to is the written statement signed by Jarmans on October 20 which was excluded from evidence. See p. 6, *supra*.

prior to the time he telephoned the police from his wife's home on the afternoon of April 19, 1962. In connection with the issue of drunkenness, then, Jarmans' first statement is admittedly voluntary. It is also clear that whether Jarmans' *second* oral statement to the police on April 20 was voluntary or not turns on the question of whether he was drunk when he first spoke to the police at the time of his arrest that day. On the one hand, Jarmans could not have *become* drunk between the time he was arrested and the time he arrived at the police station; on the other hand, if Jarmans was drunk at the time of his arrest, this Court could not find beyond a reasonable doubt that he had sobered up sufficiently to give a voluntary statement less than an hour later. For these reasons, the balance of this discussion turns on Jarmans' condition when he spoke to the police at the time of his arrest.

The only evidence that Jarmans consumed large quantities of alcohol prior to his arrest is his own statement. All other evidence indicates that Jarmans was sober. This Court rejects the self-serving testimony of the petitioner and finds beyond a reasonable doubt that petitioner was not intoxicated when he was arrested on April 20, 1962, and made his two oral statements to the police. This finding is made for the following reasons:

1. There is no evidence that is directly probative on the question of whether Jarmans was so affected by any liquor he consumed that his statements were in fact involuntary except for petitioner's own testimony that he "thought" the statements were involuntary.

The question here is not whether Jarmans had had something to drink before he confessed but whether he had drunk *so much* that his confession was not the product of his free will. Jarmans himself did not state that he was in a daze, or that he was not cognizant of what he was doing. On the contrary, he admitted that he knew what was happening; that he could drive and walk without difficulty; that he talked coherently and had no difficulty being responsive to the officer's questions.

2. Jarmans' testimony as to the amount he drank is extremely difficult to believe on its face. Jarmans asks this Court to believe that a 20 year old could, after drinking a few beers and a quarter of a pint of whiskey in mid-afternoon and early evening, drink 6 to 9 beers and a fifth of whiskey between 10:00 P.M. and 3:00 A.M. and still walk, talk and drive without difficulty. It must be recognized that such a feat is highly unlikely.

3. There is no evidence to corroborate Jarmans' testimony that he had a great deal to drink.

a. Everyone, including petitioner, agrees that petitioner *appeared* sober.

b. Twelve to thirteen hours elapsed between the time Jarmans left his wife's home on Thursday afternoon and the time he was arrested on Friday morning. Petitioner claims he spent about four hours drinking with Louis McMurray, and another two and one half hours drinking in Hogan's bar in Northwest Washington. Neither Mr. McMurray nor anyone from Hogan's bar was produced to corroborate Jarmans' story, nor was any explanation made as to why such testimony was not forthcoming.

c. Jarmans himself admitted that the first time he thought of telling anyone he was drunk at the time he confessed was more than 2 years after he had been convicted and while serving his life sentence.

d. Petitioner's claim that Jarmans' testimony at the 1968 hearing is corroborated by Jarmans' signed written statement to the police given at 5:35 A.M. on April 20, 1962, and introduced in this

proceeding as petitioner's Exhibit Number 1, is without merit.[7]

It is true that Jarmans mentions drinking in this statement. It is also true that he did not say he had a lot to drink nor did he indicate in any way that he was intoxicated at any time that night.

In point of fact, this statement contains material, in the same paragraph mentioning drinking, which impeaches statements made by Jarmans at the 1968 evidentiary hearing. At the hearing Jarmans said he left his wife's house and drove to Maryland, then drove to Virginia about 4:30 P.M. and drove back to Maryland about 8:00 P.M. In his written statement Jarmans said he left his wife, drove to Maryland and stayed there until night when he came back to the District. In addition, his statement, though very detailed, failed to include mention of Louis McMurray, the drinking of *any* beer, the making of a second liquor purchase or a two and one half hour stop at Hogan's bar. All of these points figured prominantly in his testimony before this Court almost 6 years after the written statement.

4. Jarmans had already confessed to the crime 12 hours before he was arrested at a time when he admits he had nothing to drink.

The fact that Jarmans, while sober, had already told the police by telephone that he was the killer of Olive Minard creates no presumption that his second confession was also made while sober, but it is certainly a circumstance which militates against his testimony in this proceeding. At the very least it proves that Jarmans was quite capable of confessing while not intoxicated and not coerced in any way. It also provides a plausible explanation for what might first impress one as an unusually precipitous confession. Jarmans knew that the police had his name and therefore that it would only be a matter of time before he was apprehended. Under those circumstances Jarmans might well feel, as he himself put it, glad to "get it over with."

## II

Jarmans also challenges the voluntariness of his oral inculpatory statements on the grounds that at the time he made those several statements he was suffering from a mental illness and was thus devoid of his normal will to protect himself. The statements which he asserts were thus involuntarily made by him and which were received in evidence were the April 18 and 19, 1962, statements to his wife, his telephone statement on April 19 to Officer Smith, and his April 20 statements (1) to Officers Bigelow and Wheeler and (2) to Officers Donohue and O'Brien.

The question of the state of petitioner's mental health in April 1962 was litigated at length in Jarmans' criminal action where he asserted an insanity defense. In this proceeding both the petitioner and the Government relied on the evidence adduced in the criminal case.

Prior to the 1962 trial Jarmans was committed on April 26, 1962, to St. Elizabeth's Hospital for mental examination. Under date of August 15, 1962, the Acting Superintendent of the Hospital reported to the Court that Jarmans was found not to be suffering from any mental disease or defect at that time or "on or about April 16, 1962."

At the November-December, 1962 trial Jarmans called as witnesses in support of his insanity defense Dr. Caprio, an independent psychiatrist, Dr. Beardsley, a clinical psychologist at St. Elizabeth's, and Dr. Hamman, a staff psychiatrist at St. Elizabeth's Hospital.

Dr. Caprio testified that Jarmans was possessed of "a sociopathic personality with psychotic episodes, characterized by schizophrenic reations, paranoid in nature." Dr. Caprio concluded that on April 16, 1962, the defendant was suffering from "a schizophrenic episode as-

---

7. While the written signed statement was received in evidence in this proceeding, it was, as noted above, excluded in the criminal case. See p. 766 *supra*.

sociated with [the] original diagnosis of sociopathic personality" and that this mental illness affected the defendant's mental and emotional processes, and behavioral controls on that date. Further, Dr. Caprio stated that Jarmans was in the midst of a psychotic episode, controlled by an insane compulsion to confess at each time he made statements to the police. On cross-examination, however, it became apparent that Dr. Caprio's diagnosis rested primarily on his opinion that the crime, and the defendant's plan to kill several women in order to avoid suspicion when he killed his wife, spoke for themselves. In fact, Dr. Caprio stated that prior to this incident Jarmans was *not* of unsound mind. He was *not* mentally ill until he thought up this "insane" plan involving multiple murders in order to facilitate his speedy marriage to Nadine.

Dr. Catherine Beardsley, the clinical psychologist at St. Elizabeth's who administered a battery of psychological tests to Jarmans testified that Jarmans possessed a "schizoid" personality with *"potentials"* for psychotic behavior. Whether or not that potential for "psychotic" behavior was realized, Dr. Beardsley did conclude that Jarmans was suffering from a mental illness on April 16, 1962.

Dr. Hamman testified that he did not agree with the conclusion of the staff conference held at St. Elizabeth's. He stated that he believed that the defendant suffered from a personality disorder, best described as a schizoid personality, and had the "potential, when provoked, to become psychotic over periods of time, although he did not show any psychotic behavior while in the hospital." Dr. Hamman stated that one with a schizoid personality, alone, is not psychotic. On cross-examination Dr. Hamman agreed that the *only* evidence of psychotic thinking and behavior in Jar-

mans' history was his plan to murder his wife and the actual killing of Olive Minard.

The defense produced two other doctors, Dr. Lindner, a clinical psychologist, testified that he had no personal recollection of Jarmans but that a report filed by him for the Juvenile Court in 1954 reflected that at that time he had interviewed Jarmans and found he was in the early stages of schizophrenic process with paranoid tendencies. He had no contact with Jarmans after 1954 and could not speculate as to his mental condition in 1962. Dr. Lincoln testified that although he had never met Jarmans, on the basis of records given him at Cedar Knolls in 1955, he at that time labeled Jarmans a chronic schizophrenic, paranoid variety. Like Dr. Lindner, Dr. Lincoln could express no opinion as to Jarmans' condition subsequent to the date of his original diagnosis.

In rebuttal, the Government produced Dr. Platkin and Dr. Owens of St. Elizabeth's. Both these doctors stated that Harry Jarmans was without *any* mental illness. Their conclusions were in agreement with the findings of the staff conference of July 19, 1962, in which Dr. Dobb, another psychiatrist and Dr. Kane, a clinical psychologist, as members of the conference concurred.[8] Jarmans, as has been noted, was also committed to St. Elizabeth's earlier in 1962 in connection with his arrest for stealing a motor vehicle. He, in February 1962, was found without mental disease or defect. Dr. Owens and Dr. Platkin were also members of that staff conference.[9]

Doctors Platkin and Owens testified that Jarmans had better than average intelligence; that he had no delusions or hallucinations; that his thinking and speech were coherent; that he was completely oriented as to time and place; that he could distinguish right from

---

8. Dr. Beardsley, a clinical psychologist, and Dr. Hamman, a psychiatrist, were also members of the conference. As has been noted they were not in agreement with the findings of the conference.

9. Dr. Hamman was also a member of that staff conference.

wrong; and that his ability to exercise control over his behavior was not impaired on April 16, 1962.

Dr. Platkin noted that Jarmans possessed certain symptoms of personality disorder such as "a history of inadequate relationships with others, difficulty in adjusting to society, as well as passivity in his relations with others." But Dr. Platkin concluded:

"* * * these are characteristics one may find in so-called normal people. These are characteristics that are not necessarily symptomatic or even peculiar to mental illness * * *

Although he had all these characteristics, they did not, in my opinion, suggest mental illness. These are characteristics which one may very well find in a large number of individuals who are not sick * * * [I]n my opinion there were not any of these symptoms to such a degree of intensity or severity that I would call them mental illness."

Dr. Owens' testimony also stressed that whether a diagnosis of mental illness is warranted depends on the *degree* to which personality traits vary from the norm. He concluded:

"* * * I saw this individual as having certain symptoms such as being passive or dependent, or having difficulty in his relationships with others. But these did not deviate enough from normal for me to say that this is a mental disease * * * [In other words] I see some symptoms; but they don't deviate enough from normal to warrant a specific diagnostic entity, such as schizoid personality."

As has been noted the jury trying Jarmans rejected the insanity defense and found him guilty of murder as charged. Since the issue of insanity was a factual one for the jury to decide, I, as the judge presiding at the trial, had no function in that decision. However, I heard the expert testimony and observed the witnesses and I was satisfied that the Government had proved beyond a reasonable doubt that Jarmans was not suffering from a mental disease or defect. If I had been trying the case without a jury I would have reached the same decision as the jury did.

On the basis of the evidence presented at the criminal trial, this Court finds beyond a reasonable doubt that the petitioner was without mental illness on April 18, April 19 and April 20, 1962, and therefore that his normal will to protect himself was in no way impaired when he made his statements on those dates.

In support of petitioner's claim with respect to this question counsel for petitioner states in his initial memorandum (p. 5):

"Dr. Caprio, who was called at trial in support of petitioner's defense of insanity, testified that in his opinion Jarmans was in a psychotic state when arrested and was under a mental compulsion to confess. (I TR 384–87) The doctor also stated that Jarmans' statements to his wife and call to the police the previous afternoon were the product of insane judgment. (I TR 385)"

In petitioner's Reply Memorandum, counsel also cites Dr. Hamman's testimony that Jarmans "was definitely suffering from a schizoid personality, which he has (sic) for many years and I think he was most likely schizophrenic" on April *16*, 1962.

Petitioner attempts to discount the testimony of Dr. Platkin and Dr. Owens by claiming: first, that neither of these psychiatrists were specifically asked about Jarmans' mental condition at the time he confessed; and, second, that neither of them "were * * * as certain of their opinion [that Jarmans was without mental illness] as they at first professed to be." (Petitioner's Reply Memorandum, pp. 5–6)

This Court finds no merit in petitioner's contention that Dr. Platkin and Dr. Owens did not specifically refute Dr. Caprio's testimony that Jarmans' statements were the products of "insane

judgment." The record clearly shows that Dr. Caprio's opinion was that Jarmans was not insane prior to the time he conceived the plan to kill his wife but that from the conception of that plan Jarmans was in the midst of a single psychotic episode which negated his ability to reject the plan, refrain from committing the murder, or stop himself from confessing to the police. Dr. Owens and Dr. Platkin denied that Jarmans had any mental illness whatever, either on April 16 or at the hospital, and by denying that, necessarily denied Dr. Caprio's conclusion that the *same* mental illness (viz. the psychotic episode) which caused the murder negated the voluntariness of petitioner's statements.

Similarly, this Court cannot accept petitioner's contention that Dr. Platkin and Dr. Owens had such "doubts" as to their conclusion that that conclusion should be suspect. Petitioner refers specifically to the "doubts" which succeeded the staff conference in July of 1962 and prompted Dr. Platkin to request an extension of time. Dr. Platkin and Dr. Owens, of course, had been present at *both* the staff conference in July and the one held in February of 1962 and were thus thoroughly familiar with Jarmans' case. This is the way Dr. Platkin explained the "doubt" that remained:

"Well, in view of the fact that this was a rather grave charge against him, and in view of the fact that we did not find evidence of mental illness, we thought and *hoped* that with further examination the possibility of finding some evidence of mental illness might exist." (Emphasis supplied.)

That testimony was given in explanation of St. Elizabeth's request to use an unusual and relatively untried approach and test Jarmans while he was under the influence of sodium amytal. When defense counsel refused permission for the test, the Hospital relied on the findings elicited on normal testing which evidenced that Jarmans was suffering from no mental disease or defect.

In the last analysis, the decision on this record must be made on the basis of the credibility of the witnesses testifying for each side. This Court, like the jury, finds the Government's experts to be far more credible in this case than Dr. Caprio and Dr. Hamman.

In concluding this discussion, mention should be made of petitioner's reliance on the case of Pea v. United States, 130 U.S.App.D.C. 66, 397 F.2d 627 (1968), as to both intoxication and mental illness. In *Pea* the defendant had a bullet lodged in his head at the time of the confession. He was suffering from a concussion and he could not see out of his right eye. The hospital records showed he had been drinking. Finally, and by far most important, Dr. Mena's testimony, that the defendant was indifferent to protecting himself by reason of the concussion together with the intoxication, went completely uncontradicted. In this case, the medical testimony supporting petitioner's theory as to insanity is rebutted by *other* medical testimony. Jarmans' "appearance" merely *corroborates* Dr. Platkin's and Dr. Owens' testimony. As for the intoxication issue, in this case we have *only* Jarmans' word which, as noted before, is insufficient. *Pea* is inapposite.

This Court finds beyond a reasonable doubt that Jarmans' oral confessions which were received in evidence were voluntary.

Petitioner's motion to vacate sentence is denied.