# United States Court of Appeals
## For the First Circuit

No. 12-1386

BANGOR GAS COMPANY, LLC,

Plaintiff, Appellant,

v.

H.Q. ENERGY SERVICES (U.S.) INC,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. Nancy Torresen, U.S. District Judge]

Before

Lynch, Chief Judge,

Torruella and Boudin, Circuit Judges.

Richard N. Selby, II with whom Dworken & Bernstein Co., L.P.A., Adam R. Lee and Skelton, Taintor & Abbott were on brief for appellant.
Linda M. Glover with whom Justin B. Whitley, John B. Rudolph, Winstead PC, Jotham D. Pierce, Jr., Nolan L. Reichl and Pierce Atwood LLP were on brief for appellee.

September 26, 2012

**BOUDIN**, **Circuit Judge**.  A pipeline owner--Bangor Gas Company, LLC ("Bangor")--and a natural gas supplier--H.Q. Energy Services (U.S.) Inc. ("HQUS")--entered into a contract for the transportation of HQUS' natural gas.  The parties later became embroiled in a dispute and submitted their dispute to binding arbitration.  After the arbitrators issued a decision largely favorable to HQUS, Bangor sought to vacate the decision in the district court, failed, and has now brought this appeal.

HQUS, a wholly owned American subsidiary of the Canadian government-owned utility Hydro-Quebec, sells natural gas and electricity in the United States.  Bangor provides services related to the natural gas industry in Maine.  In 1999, Bangor entered into an agreement with HQUS (the "Agreement") to build and operate a Bangor pipeline, later named the Bucksport Pipeline, to deliver HQUS' natural gas from an international pipeline nine miles away called the Maritimes Pipeline, owned and operated by Maritimes & Northeast Pipeline, LLC ("Maritimes"), to the Bucksport Energy Facility (an energy plant that served a paper mill).

The contract provided that HQUS' gas would be delivered over the Bucksport Pipeline for fifteen years for a fixed annual charge of $1,150,662, paid by HQUS in monthly installments. However, Bangor did not connect the origin end of the Bucksport Pipeline directly to the existing Maritimes Pipeline; instead, Bangor contracted to have Maritimes build a 410-foot lateral

-2-

pipeline (the "Lateral") that connected the Maritimes Pipeline to the Bucksport Pipeline and agreed that Bangor would pay Maritimes for the Lateral's use pursuant to a tariff filed by Maritimes with the Federal Energy Regulatory Commission ("FERC").

Bangor's expert later explained that this was done for technical reasons relating to proximity to electric power lines. Nonetheless, the Lateral was not mentioned in the Agreement, and the Agreement's language may suggest that the parties to it contemplated that the Bucksport Pipeline would directly connect to the Maritimes Pipeline. It was apparently not until 2006, six years after the Bucksport Pipeline opened, that HQUS learned of the Lateral and that the Bucksport Pipeline did not connect directly to the Maritimes Pipeline.

During this six-year period, HQUS paid the agreed upon rate to Bangor; Bangor in turn compensated Maritimes for the use of the short Lateral pipeline of whose existence HQUS was ignorant. This harmonious state of affairs began to dissolve when Bangor was itself acquired by a parent company which apparently concluded that Bangor's compensation of Maritimes might be in violation of rules or policies of the FERC, the federal agency which now regulates much of the traffic in natural gas in the United States.

Under a FERC edict known as the "shipper-must-have-title" rule, a shipper of natural gas must hold title to the gas it is shipping. The rule is not a codified regulation but was announced

by FERC in an adjudication of a specific dispute.[1]  The aim of the rule is to prevent big natural gas distributors from buying up pipeline capacity that they do not need for shipment of their own gas and leveraging their market power by selling the capacity to third parties at excessive prices.

Bangor concluded that, as the party who controlled the capacity of the Lateral by virtue of its lease, it would be deemed under FERC's nomenclature "the shipper" of gas traveling over the Lateral.  And, as HQUS owned gas traveling through the Lateral, Bangor might be deemed in violation of the shipper-must-have-title rule.  Bangor consulted with FERC with the result that, in 2007, FERC found that Bangor had violated the shipper-must-have-title rule with respect to the Lateral (as well as another pipeline), and approved a consent agreement by which Bangor paid a $1 million fine.  Bangor Gas Co., LLC, 118 F.E.R.C. ¶ 61,186 (2007).

Beginning in 2006, Bangor sought to comply with the rule by entering into "capacity releases" with HQUS in which HQUS would replace Bangor as the party who held capacity rights in the Lateral, and thus as the "shipper" on the Lateral.  In the earliest of these capacity releases HQUS did not pay the costs of using the Lateral; but HQUS began paying those costs in August 2009 after

---

[1]Tex. E. Transmission Corp., 37 F.E.R.C. ¶ 61,260, at 61,685 (1986); see also Demarest, Gas Marketing by the Operator Under a JOA--Unrecognized Regulatory Risks and Practical Solutions, 64 Okla. L. Rev. 135, 136-38 (2012).

-4-

Bangor threatened to place its capacity rights on the Lateral up for competitive bidding. Whether HQUS should pay became one of the two main issues in the ensuing dispute between the two companies.

The other dispute involved the costs for heater fuel to heat the gas at two points: at the connection between the Lateral and the start of Bucksport Pipeline, and at the end of the Bucksport Pipeline as the gas enters the energy plant. The latter satisfied a contractual obligation of Bangor to deliver the gas at 80°F or above. The Agreement was silent on who was to pay for heating. Bangor had been paying for the heater fuel since the inception of the agreement, but in 2009 Bangor asserted that HQUS should pay those costs.

The Agreement provided that irreconcilable disputes would be submitted to binding arbitration, and Bangor initiated arbitration on December 6, 2010. Each party selected one arbitrator, and those two arbitrators chose a third arbitrator; all three were experienced in the energy industry, and one was a former FERC Commissioner. Bangor sought to have HQUS pay both the Lateral costs and the heater fuel costs. HQUS denied responsibility and counterclaimed for a reimbursement of payments it had made for the Lateral since 2009.[2]

---

[2]The Agreement specified that Bangor was responsible for delivering gas from the point of receipt, defined as "[t]he outlet of the meter installed at the interconnection between the Maritimes Pipeline and the distribution facilities of [Bangor]." The meter is located at the connection between the Lateral and the Bucksport

The arbitration panel reviewed briefs, written testimony and documents submitted by the parties, and held a three-day hearing. On September 1, 2011, the panel issued a written award that was largely favorable to HQUS, deciding that Bangor was responsible for paying Maritimes for use of the Lateral. As to heater costs, the arbitrators placed the future cost burden for heating at the delivery end upon HQUS but declined to order it to pay for past heating.

On the Lateral costs issue, the arbitrators noted that the Agreement contemplated that the Bucksport Pipeline would connect to the Maritimes Pipeline, which meant that the parties thought that HQUS was purchasing for its original monthly payment transportation of gas all the way from the Maritimes Pipeline to the energy plant. The panel inferred from Bangor internal documents that the contract rate in Bangor's bid to HQUS already accounted for the cost of transporting gas on the 410 feet that comprised the Lateral and the cost of the junction point meter installed by Maritimes. Thus, forcing HQUS to pay Maritimes in addition to paying Bangor would unjustly require HQUS to pay twice for the transportation and meter.

The panel acknowledged that the shipper-must-have-title rule posed difficulties but the panel adopted a two-part solution:

---

Pipeline, so Bangor argued that it should not be responsible for paying for transportation on the Lateral, which occurs before the gas reaches the meter.

-6-

(1) Bangor would continue to release its capacity on the Lateral to HQUS, and HQUS would pay Maritimes for use of the Lateral, but (2) Bangor would reimburse HQUS for the Lateral costs in the form of a comparably reduced rate for use of the Bucksport Pipeline. In addition, the panel ordered Bangor to reimburse HQUS for costs that HQUS (under threat) had already paid to Maritimes.

On the heater fuel issue, the panel decided that HQUS should pay for the fuel for the heater at the site of the energy plant, later making clear that Bangor would pay for heating at the origin end. The panel stated that under standard industry practice, the customer ordinarily paid for the heater fuel required to meet a customer-specific need and it viewed this to be the basis for the heating at the delivery point.

The panel decided to make the award as to the heater fuel prospective and not retroactive, citing a number of equitable factors: (1) that the issue is "a close question that is not directly addressed in the Agreement"; (2) that Bangor's history of paying for the fuel led HQUS to legitimately expect continued payment; and (3) that documenting and calculating past heater fuel costs would be "difficult and contentious." HQUS ultimately accepted this disposition of the heating cost issue; Bangor did not.

After the award, both sides sought clarification. Pertinently, Bangor expressed concern that the panel's capacity

release and reimbursement solution could still violate FERC regulations, and that Bangor could end up paying further large penalties. Bangor asked the panel to stay the award until it received a response to a letter Bangor had sent to FERC staff seeking assurance against a FERC enforcement action. The panel denied the request, stating that it was "not at all likely" that FERC would find the arrangement illegal. However, the panel

> direct[ed] that HQUS promptly provide to Bangor written confirmation that it will return any reimbursement amounts it receives from Bangor, and will repay any capacity release payment amounts it credits against payments otherwise due under the Bangor/HQUS service agreement, to the extent necessary to comply with any finding by the FERC that the reimbursement and crediting arrangements are not consistent with FERC policy.

HQUS subsequently provided Bangor with the written commitment.

On November 10, 2011, FERC's General Counsel and Director of the Office of Enforcement denied Bangor's request that FERC staff issue a "No-Action Letter" promising that enforcement actions would not be brought against Bangor for implementing the panel's reimbursement remedy. Instead, the staff expressed its view that "[t]he Panel's remedy . . . would violate the Commission's posting and bidding regulations," which state that a capacity release must be posted for competitive bidding, unless it is done at the maximum applicable rate under the pipeline's tariff filed with FERC. 18 C.F.R. § 284.8(c)-(e), (h)(1) (2012).

Although Bangor's release of capacity on the Lateral to HQUS in terms required HQUS to pay the maximum rate, the FERC staff stated that the reduced Bucksport Pipeline charges accepted by Bangor amounted to a discount on the Lateral payments that triggered the competitive bidding requirements. The staff noted that "this response only expresses Staff's position on enforcement action and does not express any legal conclusions on the questions presented," and that it "is not binding on the Commission." In a subsequent letter to HQUS, the same FERC staff reiterated that its previous letter was not binding, stating that if "HQ Energy or Bangor wants a definitive answer from the Commission, it may file for a declaratory order, as the Commission speaks through its orders."

On November 30, 2011, Bangor Gas filed a motion with the district court under the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16 (2006), to vacate in part and confirm in part the arbitration award. The request to vacate aimed at the panel's imposition of Lateral costs on Bangor and at the panel's refusal to require repayment by HQUS of past destination-end heater costs incurred by Bangor. Bangor also argued that the FERC staff letter triggered HQUS' commitment to refund past Lateral reimbursements to Bangor. Ultimately, the district court denied Bangor's motion and granted HQUS' motion to confirm the award.

We review the district court's decision de novo, but our review of the arbitration award itself is "extremely narrow and exceedingly deferential." Bull HN Info. Sys., Inc. v. Hutson, 229 F.3d 321, 330 (1st Cir. 2000) (quoting Wheelabrator Envirotech Operating Servs. Inc. v. Mass. Laborers Dist. Council Local 1144, 88 F.3d 40, 43 (1st Cir. 1996)). The FAA "embodies a national policy favoring arbitration," Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 443 (2006), and provides only a narrow set of statutory grounds for a federal court to vacate an award:

> (1) where the award was procured by corruption, fraud, or undue means;
>
> (2) where there was evident partiality or corruption in the arbitrators, or either of them;
>
> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
>
> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).

In addition, this court in the past recognized a common law ground for vacating arbitration awards that are in "manifest disregard of the law," McCarthy v. Citigroup Global Mkts. Inc., 463 F.3d 87, 91 (1st Cir. 2006) (quoting Wonderland Greyhound Park,

-10-

Inc. v. Autotote Sys., Inc., 274 F.3d 34, 35 (1st Cir. 2001), while limiting this notion primarily to cases where the award conflicts with the plain language of the contract or where "the arbitrator recognized the applicable law, but ignored it." Gupta v. Cisco Sys., Inc., 274 F.3d 1, 3 (1st Cir. 2001).

The manifest-disregard doctrine has been thrown into doubt by Hall Street Associates, L.L.C. v. Mattel, Inc., 552 U.S. 576 (2008), where the Supreme Court "h[e]ld that [9 U.S.C. § 10] . . . provide[s] the FAA's exclusive grounds for expedited vacatur." Id. at 584 (emphasis added). This has caused a circuit split,[3] with this court saying (albeit in dicta) that "manifest disregard of the law is not a valid ground for vacating or modifying an arbitral award in cases brought under the Federal Arbitration Act," Ramos-Santiago v. United Parcel Serv., 524 F.3d 120, 124 n.3 (1st Cir. 2008).

Even if the manifest-disregard doctrine were assumed to survive and were applied in this case, the award neither conflicts

---

[3]Compare Wachovia Secs., LLC v. Brand, 671 F.3d 472, 480 (4th Cir. 2012) (recognizing continuing validity of manifest disregard doctrine), Johnson v. Wells Fargo Home Mortgage, Inc., 635 F.3d 401, 415 n.11 (9th Cir. 2011) (same), Stolt-Nielsen SA v. AnimalFeeds Int'l Corp., 548 F.3d 85, 94 (2d Cir. 2008), rev'd on other grounds, 130 S. Ct. 1758 (2010) (same), and Coffee Beanery, Ltd. v. WW, L.L.C., 300 Fed. App'x 415, 418 (6th Cir. 2008) (unpublished opinion) (same), with Frazier v. CitiFinancial Corp., 604 F.3d 1313, 1324 (11th Cir. 2010) (rejecting manifest disregard doctrine as invalid), Citigroup Global Mkts., Inc. v. Bacon, 562 F.3d 349, 350 (5th Cir. 2009) (same), and Crawford Grp., Inc. v. Holekamp, 543 F.3d 971, 976 (8th Cir. 2008) (same).

with the plain language of the Agreement nor did the arbitrators recognize the applicable law but ignore it. The panel resolved what is at best an argument about how a contract of questionable meaning should be read and harmonized with a FERC doctrine on leasing capacity. Under settled precedent, an FAA award cannot be overturned based on mere disagreement by the court with the panel on a debatable issue, Advest, Inc. v. McCarthy, 914 F.2d 6, 9 (1st Cir. 1990); and in this instance the panel's decision is in our view entirely reasonable.

The Lateral Issue. Bangor argues that the panel's decision to make Bangor pay for the Lateral costs was in manifest disregard of the law on two grounds: that the panel's ruling contravenes the clear language of the Agreement by making Bangor responsible for Maritimes' charges for the Lateral's use, and that the panel's remedy results in a violation of FERC regulations (and by extension, a principle of Maine contract law that disfavors the enforcement of illegal contracts). Both claims are that the panel ignored the law, but in two quite different ways.

The first claim, resting on interpretation of the Agreement, is hopeless. The better reading of the Agreement is that HQUS' ongoing monthly payments to Bangor already compensate Bangor for moving the gas from Maritimes' main line to HQUS' customer; indeed, Bangor seemingly calculated the monthly charge on that assumption. In commissioning the Lateral, Bangor chose to

-12-

hand off part of its obligation to Maritimes, and is now trying to make HQUS shoulder the cost a second time over. Nothing in the Agreement mentions the Lateral, let alone obliges HQUS to pay separately for its use.

Admittedly, the Agreement requires Bangor to start paying at the "Point of Receipt," which is defined as the meter that is located at the origin end of the Lateral; but it was Bangor's own undisclosed choice to make the connection with Maritimes--and thus to locate the junction meter--at a point 400 feet away from where HQUS reasonably expected it to be. The Agreement, by contrast, contemplated a pipeline "between the Maritimes and Northeast Pipeline and the Energy Plant." Bangor's claim based on the Agreement is plainly wrong.

More difficult is Bangor's argument that the panel's remedy of capacity releases and reimbursements places Bangor in violation of FERC requirements. There is, it should be stressed, no basis for claiming the Agreement itself violated the FERC's governing statute or its pertinent rules or regulations: had Bangor built its Bucksport Pipeline to run from Maritimes' main line as was contemplated, no Lateral line would have been required. Bangor's difficulties with FERC ensued afterwards and from Bangor's unilateral action in commissioning the Lateral.

But FERC rules and regulations are, so far as they are valid, in the nature of sovereign commands representing a public

purpose; and we will assume (arguendo but with some confidence) that an arbitration award would be vulnerable to the extent that it directed one or both of the parties clearly to violate a such a mandate. Yet there is nothing clear-cut about FERC's actual intentions, ample reason to think a reasonable agency would stay its hand, and fair precautions adopted by the panel if FERC acts otherwise.

Here, the panel considered FERC rules and regulations and structured its award in a way that it "believe[d] . . . [would be] fully consistent with FERC policy." In its initial decision, the panel sought to accommodate the shipper-must-have-title rule by having Bangor release its capacity to HQUS, which would thereby become the shipper as well as the owner of the gas. Thus, as a formal matter, HQUS would become responsible to pay Maritimes for the capacity, albeit compensated by a reduced charge on the Bucksport Pipeline, the monthly payment for which already covered the transportation of gas from Maritimes' main pipeline onward.[4]

---

[4]Under the panel's arrangement, HQUS acquired usage rights to the Lateral capacity and thus became "the shipper"; and, as it was also the owner of the gas, the shipper-must-have-title was satisfied--as it had not been when Bangor held the usage rights and was heavily fined by FERC in the earlier consent order. The FERC staff's problem with the panel's remedy does not concern the shipper-must-have-title rule; rather, it concerns the separate regulation dictating that capacity releases (such as Bangor's release to HQUS on the Lateral) must be posted for competitive bidding unless they are at the maximum FERC tariff rate. See 18 C.F.R. § 284.8(c)-(e), (h)(1).

True enough, the FERC staff thereafter said that the release of capacity by Bangor without competitive bidding could be viewed as charging the required "maximum rate" in form, while in substance reducing that price through the reimbursements Bangor paid HQUS for transportation on the Bucksport Pipeline. But, as the staff admitted, FERC is not obliged to take this view. Alternatively, FERC could accept the staff position but (in our view) reasonably waive its maximum-rate regulations in the peculiar circumstances of this case.

The shipper-must-have-title rule was designed to deal with a problem perceived by FERC as the agency sought to create a competitive market in pipeline capacity as part of a long-term effort to (in some measure) deregulate the industry. Pipelines potentially possess market power over gas transportation, but the agency provided incentives and later mandates for the pipelines to make capacity available on a market basis to competing intermediaries; the aim to create and maintain that competitive market in transportation capacity is the premise of the rules and regulations of concern here.[5]

---

[5]Order No. 436, Regulation of Natural Gas Pipelines After Partial Wellhead Decontrol, 50 Fed. Reg. 42,408, 42,413, 42,424 (Fed. Energy Regulatory Comm'n Oct. 18, 1985) (providing incentives for pipelines to offer unbundled transportation services); Order No. 636, Pipeline Service Obligations and Revisions to Regulations Governing Self-Implementing Transportation; and Regulation of Natural Gas Pipelines After Partial Wellhead Decontrol, 57 Fed. Reg. 13,267, 13,270 (Fed. Energy Regulatory Comm'n Apr. 16, 1992) (mandating that pipelines offer unbundled transportation services

But maintaining a competitive market in pipeline capacity transfers is primarily important in large capacity pipes that might be used by multiple shippers and often for multiple destinations; in that situation, if one "customer" or a small group were able to buy up capacity beyond their own needs, they might forestall competition by charging excessive prices for re-releases to others or impose discriminatory policies that disadvantage smaller competitors. This is the expressed explanation for both the shipper-must-have-title rule and the bidding regulation. See note 4, above.

But the present 410-foot Lateral was designed simply to serve the Bucksport Pipeline, which was itself aimed to send gas a mere nine miles from the main Maritimes Pipeline to a single customer, and Bangor had already committed the Bucksport Pipeline to carry HQUS gas to the energy plant at the far end. In these circumstances, the rationale for the shipper-must-have-title rule and maximum-tariff-rate regulations seems minimal; and imposed bidding for the Lateral capacity would be of benefit only to a spoiler who might aim to hold up Bangor and HQUS alike.

Further, while Bangor might perhaps have been properly sanctioned for a naked (albeit seemingly harmless) violation of the

---

on nondiscriminatory terms); see also U.S. Gen. Accounting Office, GAO/RCED-87-133BR, Natural Gas Regulation: Pipeline Transportation Under FERC Order 436, at 13-14 (1987); McGrew, FERC 118-19 (2d ed. 2009).

shipper-must-have-title rule by its original decision to outsource its obligations, forbidding the panel remedy would merely give Bangor an unjustified (and probably temporary) advantage by transferring costs to HQUS--the innocent party--for which Bangor was contractually responsible and for no obvious public end. Assuming a court would permit FERC to so act, it is hard to see why FERC would care to do so.

It is hardly surprising that the staff felt unable to provide assurance against such a risk or that it felt compelled to point out the formal danger posed by the panel's remedy; this follows both from bureaucratic imperatives familiar to anyone who has served in government and from a due regard for the comparative authority of the staff vis-à-vis the commissioners. But the staff itself pointed out that the ultimate decision as to the meaning of its requirements belonged to the commissioners (as does the power to waive regulations).

Bangor claims that the staff's statement that "[t]he Panel's remedy . . . would violate the Commission's posting and bidding regulations" itself triggers HQUS' commitment to pay a refund of $297,547.50 to Bangor; this is supposedly based on the written assurance HQUS gave that it would return any reimbursements it received from Bangor for the Lateral costs "to the extent necessary to comply with any finding by FERC that the reimbursement and crediting arrangements are not consistent with FERC policy."

But the statements by FERC officials are not FERC findings. On the contrary, the FERC staff made abundantly clear in two letters that their statements were not definitive and were not binding on FERC. FERC itself has warned that parties cannot rely on non-binding opinions from FERC staff because "[t]he Commission speaks through its orders." Indianapolis Power & Light Co., 48 F.E.R.C. ¶ 61,040, at 61,203 (1989). Finally, FERC has the authority to grant waivers from its shipper-must-have-title rule and its capacity release regulations. See Atlanta Gas Light Co., 85 F.E.R.C. ¶ 61,102 (1998).

In sum, there is no clear indication that FERC will seek to undo the reimbursement remedy crafted by the panel which has been tailored to avoid any direct affront to FERC rules or regulations, requirements whose underlying purpose seems hardly implicated by the peculiar circumstances of this case: a 410-foot pipeline dedicated to connect to a single-customer spur pipeline. And, if the premise that FERC will tolerate this reasonable improvisation proves false, the panel has made provision for this contingency as well.

Heater Fuel Cost Retroactivity. As already explained, the panel imposed destination-end heating costs on HQUS for the future but declined to make this ruling retroactive, and Bangor terms this refusal a "compromise" that violated the Agreement's "no compromise" clause. Bangor says that the panel called the heating-

-18-

cost issue a "close question" and, by imposing only the going forward costs on HQUS, must have been compromising the matter. This is a misreading of the "no compromise" clause, which states:

> In the event that the arbitration requires a decision (I) as to the allocation or payment of any monetary amounts or valuations to be reduced to monetary amounts, or (ii) the methodology or accuracy of any calculation related thereto, the arbitrators shall select the position of that Party which the arbitrator believes most appropriate under the circumstances. No "compromise" determination or alternate calculations shall be made by the arbitrator who is bound to adopt the position of one Party to the exclusion of the other on such matters.

This provision, governing a class of amount-related controversies that might arise in arbitrated disputes, requires the panel to pick the better position as between the conflicting ones offered by each side on how to read or implement the Agreement on each particular point, rather than merely adopt some intermediate compromise position and thereby split the difference. But the panel in this case was deciding two different issues and each was, in substance, decided on the merits.

The first question was whether to impose liability for the disputed costs on HQUS or Bangor: the contract did not address the question; Bangor had itself apparently assumed it was responsible for six years which is hardly surprising since the Agreement required it to deliver the gas at the specified minimum temperature; but industry practice allegedly favored imposing the

-19-

cost on HQUS so the panel adopted Bangor's position.  It did not say, as a compromise might, that each side should pay half the cost.

The panel then faced the second question whether HQUS should now compensate Bangor for past costs it had voluntarily borne since the start of the contract.  The Agreement was equally silent on this issue; and the panel cited prudential considerations in rejecting backward-looking compensation, deciding for HQUS on the issue.  That the panel decides one issue on the merits for one side and another on the merits for the other, giving reasons for each, is hardly what the no compromise clause aimed to forbid.

Bangor assumes that by some principle the forward-looking solution invincibly entails a remedy that tries to make the past conform to the future but this is mistaken.  In fact, courts, usually having less freedom than we associate with arbitration, regularly treat issues of retroactivity as distinct from rules crafted to meet the future.  See, e.g., Johnson v. New Jersey, 384 U.S. 719, 726-32 (1966) (declining to apply the rule of Miranda v. Arizona retroactively).

Disputed Exhibits.  Bangor's final argument is that the arbitrators committed "misconduct," justifying vacating the award under section 10(a)(3) of the FAA, by considering in its decision two documents (Attachments 1 and 2) among the three that the panel attached to its written decision.  Two of these had not been

-20-

submitted by the parties but were taken from filings that Maritimes had submitted in public FERC filings.

Attachment 1 contained budgetary figures for Maritimes' provision of the Lateral, which revealed that over ninety percent of the cost arose from the meter facility, and less than ten percent arose from the pipeline itself.  Attachment 2 was an excerpt from a general statement of Maritimes' policies, revealing that Maritimes requires customers to pay for connecting pipelines and associated facilities (such as meters) constructed by Maritimes.  Attachment 3 (submitted by both sides and plainly part of the record), indicated that Bangor's bid included the cost for the meter.

Considering these documents together, the panel concluded that Bangor's fixed charge to HQUS specified in the Agreement at the outset already accounted for the meter, which formed the vast majority of the cost of the Lateral.  Such a fact was unhelpful to Bangor's overall attempt to now shift the Lateral's costs to HQUS; but given that the agreed charge was all that HQUS had ever agreed to pay for what Bangor appeared to have promised, showing that Bangor had built in these costs to the monthly charge was mere frosting.

So even if we were to assume dubitante that consideration of these two additional documents was "misconduct" under the FAA, it could not have been prejudicial, a requirement for vacating an

award under section 10(a)(3).  <u>Hoteles Condado Beach, La Concha &
Convention Ctr.</u> v. <u>Union de Tronquistas Local 901</u>, 763 F.2d 34, 40
(1st Cir. 1985).  Bangor says that it was unjustly deprived of the
opportunity to respond to the documents and the arbitrators'
assumptions but does not explain what it would have said if allowed
to do so.

The judgment of the district court is <u>affirmed</u>.  HQUS has
asked that we order Bangor to pay double HQUS' costs and attorneys'
fees for filing a frivolous appeal, Fed. R. App. P. 38; although we
find Bangor's appeal to fail on the merits, its positions are not
so weak as to be deemed frivolous, and HQUS' request for sanctions
is <u>denied</u>, although it is entitled to the usual costs of the
appeal.

<u>So ordered.</u>